JAMES C. BELL AND ROBERT GRANT, PLAINTIFFS IN ERROR, v. MATTHIAS BRUEN.

A letter of guarantee, written in the United States, and addressed to a house in England, must be construed according to the laws of that country.

Extrinsic evidence may be used to ascertain the true import of such an agreement, and its construction is matter of law for the court.

In bonds, with conditions for the performance of duties, preceded by recitals, the undertaking, although general in its terms, is limited by the recital.

Commercial letters are not to be construed upon the same principles as bonds, but ought to receive a fair and reasonable interpretation according to the true import of the terms; to what is fairly to be presumed to have been the understanding of the parties; and the presumption is to be ascertained from the facts and circumstances accompanying the entire transaction.

The court will not express an opinion upon a matter of defence which was not brought to the consideration of the court below.

Bell et al. *v.* Bruen.

THIS case was brought up by writ of error, from the Circuit Court for the district of New York.

The plaintiffs in this court, who were also plaintiffs below, were merchants and partners, trading under the name and firm of Bell and Grant, and resided in London. The action was brought to recover the value of five several sets of bills of exchange, amounting respectively to £385, £318 12s. 6d., £1500, £140, and £3500, which, it was alleged, were guarantied by the defendant.

At the trial of the case in the Circuit Court, the defendant pleaded *non-assumpsit* and the statute of limitations; but the questions arising under the latter plea were not argued, as the opinion of the court, upon the guarantee, was against the plaintiffs.

The facts of the case, according to the evidence, were as follow:

Prior to the year 1830, George W. and H. Bruen, two sons of the defendant, had been carrying on commercial business under the partnership name of G. W. and H. Bruen, in the city of New York. In that year they failed, and William H. Thorn succeeded to the business of the house; George W. Bruen, one of the former partners, being interested in the business of the said Thorn.

In the year 1831, George W. Bruen also transacted business at New York, in the name of his father, the defendant. There was no regular, established house in the name of the defendant, although subsequently adventures were conducted in his name. This agency was carried on under two very extensive powers of attorney, which were duly recorded, in New York, throughout the years 1831–2–3–4, and part of 1835, when the defendant was preparing to go to Europe, and the powers of attorney were revoked.

Early in the year 1831, Thorn had credits furnished to him by Bell and Grant, upon houses in Trieste, Messina, Leghorn, and Marseilles. On the 23d February, 1831, he wrote to Bell and Grant, and among other things said, "My friends in Marseilles might secure many consignments for me, if I could put them in a situation to make the necessary advances, and I therefore hope you will oblige me by opening the credit I ask for, and, if you require it, Mr. M. Bruen will give you his guarantee. I enclose a letter for Messrs. Archias and Co., which you will forward to

Bell et al. *v.* Bruen.

them, should you think proper to open the credit; otherwise, I do not wish you to send it, as it relates entirely to this credit, and the manner in which the advances are to be made; it is understood, that no more than £2000 are to be drawn for at any one time, and that the credit is then to be considered at an end, until your advances are covered by remittances from me, when you will again renew it."

On the 22d of March, 1831, Bell and Grant acknowledged the receipt of the above, by a letter from which the following is an extract: "We have received, since the above, your letter of the 23d ult. with an enclosure for Messrs. Archias and Co., of Marseilles, which we forward to them to-day, with a confirmation of the credit you give them upon us to the amount of £2000, for the purpose of making advances on consignments, and which we will accordingly thank you to have guarantied to us, as you propose, by Mr. Matthias Bruen."

On the 23d April, 1831, Mr. Matthias Bruen, the defendant, wrote the following letter to Bell and Grant:

"*New York*, *23d April*, 1831.

"DEAR SIR,—Our mutual friend, Mr. Wm. H. Thorn, has informed me, that he has a credit for £2000, given by you in his favour with Messrs. Archias and Co., to give facilities to his business at Marseilles. In expressing my obligations to you for the continuation of your friendship to this gentleman, I take occasion to state, that you may consider this, as well as any and every other credit you may open in his favour, as being under my guarantee."

On the same day, the 23d of April, Thorn wrote to Bell and Grant a letter, from which the following is an extract: "Enclosed you will find Mr. M. Bruen's guarantee, and as you are now fully secured in any credit you may open for me, I hope you will consider on the propriety of allowing me to make insurance here on any goods that may be shipped for my account."

On the 14th June, 1831, Bell and Grant acknowledged the receipt of Bruen's letter as follows:

"MATTHIAS BRUEN, ESQ., *New York*.—We are in receipt of your favour of the 23d April, guarantying the credit opened on behalf of Mr. W. H. Thorn, with Messrs. Archias and Co., of Marseilles, for £2000, for the purpose of facilitating his business

with that place, and moreover, desiring us to consider, as under your guarantee, also, all credits existing, or that we may hereafter open for said friend, of which we take due note. And we trust that Mr. Thorn, as well as your good self, will have every reason to be satisfied with the confidence which we feel a pleasure in assigning to both of you."

It was given in evidence that from 1831 to 1837, Thorn, by means of the credits opened for him at various places, received consignments from those places, upon which advances had been made, and sent remittances, from time to time, to Bell and Grant, in London.

On the 3d of March, 1834, Thorn wrote to Bell and Grant as follows: "I have informed Messrs. R. Anderson and Co. and Messrs. Archias and Co. that the times are such as to render consignments no longer desirable, which I hope will reach them in time to prevent any further draft on you."

On the 7th of March, 1834, Bell and Grant wrote to Thorn, "We beg your reference to the foregoing copy of our letter of yesterday, and have only at present to add thereto an extract of what we write to-day, (while communicating with them on other business,) to Messrs. Archias and Co., of Marseilles, recommending their refraining from pressing shipments to you on consignment, until the state of commercial matters in the United States shall make business more acceptable, than, under the recent circumstances, we may presume it would be to you.

"We trust that the next accounts from your side will be less gloomy, and may enable us, as we shall most readily do in such case, to place business for you on its former footing."

On the 24th April, 1834, Thorn wrote to Bell and Grant: "I have read what you have been pleased to write to Messrs. Archias & Co. on the subject of consignments under advances, which meets my warmest approbation, as you will have seen by my letter of March 3d."

On the 21st of October, 1834, Bell and Grant wrote to Thorn: "Messrs. Archias & Co., of Marseilles, having inquired of us, under date 9th inst., whether you had opened a credit in their favour upon us, to make advances on shipments to your address, as you had mentioned to them as your intention of doing, and adding that they did so in consequence of the prospect they then

had of influencing a consignment to you; we told them, by return of post, that, although we should be ready at any time to confirm any such arrangement, and were yet without your authority to that effect, they might consider themselves at liberty to value upon us for your account to the extent of £2000 sterling, on handing us the customary shipping documents, (as we would have been sorry to see such business pass your door for want of the facilities in question,) expressing a hope at the same time that they would only grant such advances on property, the sale of which, they felt assured by their latest advices, would be of ready sale in the New York market; all of which we trust will meet your entire approbation. We should have extended the credit in question to the former sum of £3000, but that for the present we conceived you would be better pleased with the lesser amount; you have, however, only to let us know your wishes in this respect to insure our conformity thereto."

On the 31st October, 1834, Thorn wrote to Bell and Grant: "I have to request that you will open the following credits for my account: To Messrs. R. Anderson and Co., Gibraltar, for the purpose of making advances, per my account, £4000, to Messrs. Archias and Co. for the same purpose, £4000; to Messrs. Francia, Brothers and Co., of Gibraltar, £2500."

On the 3d of December, 1834, Bell and Grant wrote to Thorn: " We have now the pleasure of acknowledging the receipt of your much esteemed favour of the 31st October, in compliance with which we have immediately increased the credits already opened for your account with Messrs. Robert Anderson and Co., of Gibraltar, and Messrs. Archias and Co., of Marseilles, to the sum of £4000 each, and opened fresh ones of £2500, say two thousand five hundred pounds in favour of Messrs. Francia, Brothers and Co., of Gibraltar, to enable them to grant advances on consignments to you from thence and from Malaga.

" And it is moreover understood, that so soon as the credits in favour of the three first-named houses have been used and remitted for by you, we are to re-open the same accordingly, which shall be attended to."

One of the bills upon which the suit was brought, was drawn under the above credit by R. Anderson and Co. upon the plaintiffs,

Bell et al. *v.* Bruen.

dated on the 16th December, 1836, for £318 12*s*. 6*d*., at ninety days after date, which bill was paid by the plaintiffs.

On the 31st of March, 1836, Thorn wrote to Bell and Grant: " I have sold a large parcel of San Lucas wine, consigned to me by Messrs. La Cave and Echicopar, per Lurin, which may lead to further shipments; and as they will require a credit opened to enable them to make advances, you will please authorize them to draw on you, on the usual conditions, to the extent of £2500, say two thousand five hundred pounds."

Another of the bills upon which the suit was brought, was drawn under this credit by La Cave and Echicopar upon the plaintiffs, dated on the 22d November 1836, for £385 sterling, which was paid by the plaintiffs at maturity.

On the 15th of August, 1836, Thorn wrote to Bell and Grant: " I intend to send a vessel to Smyrna for an assorted cargo, and will thank you to open a credit to Messrs. G. Amac, Zipcey and Co., to that place, to the extent of £3500."

Two other of the bills upon which the suit was brought, were drawn upon the credit thus opened, by Amac, Zipcey and Co. upon the plaintiffs, dated on the 7th of January, 1837, one for £1590, and the other for £140, which were paid at maturity.

In November, 1836, the defendant went to Europe, and did not return until the following August. During his absence he was in London, where he saw the plaintiffs several times.

On the 16th of February, 1837, G. F. Darby, the agent of the plaintiffs residing in New York, drew bills of exchange upon them to the amount of £4000 sterling, which bills he loaned to Thorn, upon collateral security and the guarantee of G. W. Bruen.

On the 8th of March, 1837, Thorn wrote to Bell and Grant: " As this remittance will very nearly balance my old account, I have prevailed on Mr. Darby to open me a credit similar to the last, and on the same conditions, for £3500, which shall be punctually provided for on the 8th May next, if not sooner."

On the same day, four of the bills upon which the suit was brought were drawn upon the credit thus opened, which amounted, in the whole, to £3500, and were accepted and paid when due by the plaintiffs. These bills were guarantied by George W. Bruen, the same person who had guarantied the loaned bills for

£4000, and who, at this time, was in good credit, and could have raised £4000 on his notes.

On the 10th of April, 1837, Thorn failed and was insolvent, and the means of his house exhausted.

On the 26th of November, 1839, Grant, then in New York, wrote to the defendant, applying to him for the balance due to his London firm, and saying, "Any further explanation you may require I am ready to give, but I must request your attention in the mean while to the above claim, which I make under your letter of guarantee to Bell and Grant, for any credits they might open in favour of Mr. Thorn, and of which letter I sent you a copy, at your request, last February twelve-month."

In the trial of the cause in the court below, the plaintiffs proved by the evidence of one Schenck, that he was for many years the cashier of Bell and Grant, and greatly in their confidence; that he was well acquainted with their daily mercantile operations; that, as well from his perusal, at the time, of the letters which were received and written by them on the subject of their account and transactions with Thorn, as also from various conversations which he had with them, and the directions which he received with regard to the bills, he had no doubt whatever but that the credits given to the various houses who drew the bills, were given by Bell and Grant in full reliance on the letter of guarantee which had been written to them by the defendant.

The evidence being closed in the court below, the counsel of the defendant prayed the court to instruct the jury, among other things, as matter of law, that the letter of guarantee, of April 23, 1831, was void, as not expressing a consideration; that the said letter of guarantee was confined to credits to be opened to the house of Archias and Co., or other houses with whom Thorn might deal at Marseilles, and therefore could not cover the advances upon the bills of exchange given in evidence. And thereupon the judges did declare their opinion and decide, as matter of law, that by the true construction of the said letter of guarantee, of April 23, 1831, the same only embraced credits which should be opened for account of William H. Thorn to the house of Archias and Co., of Marseilles, and that the evidence

Bell et al. *v.* Bruen.

of the other matters in that behalf proved, did not give the said letter of guarantee a more enlarged application; and, therefore, that the jury ought to find a verdict for the defendant.

To this instruction the plaintiffs' counsel excepted.

*Lord* and *Sergeant*, for the plaintiffs in error.

*Choate,* for the appellees.

*Lord,* for the plaintiffs, said that the consideration was sufficient, as the defendant's son was a partner in the house whose prosperity was to be increased. 9 Cranch, 348; 6 Binney, 201; 15 Peters, 314.

In the guarantee there is no limitation of time or amount, as to the credit with Archias and Co. Why limit it to others and not to them? The defendant relied upon his supervision over the house, and his being able to revoke the credit whenever he might apprehend danger.

Such guarantees are not the subject of technical criticism; they are not the work of lawyers, but merchants in the course of business, and are not to be judged by the strict rules of the common law. Being of a continuing character, they involve the highest expression of confidence.

The doctrine of construction never arises until some ambiguity exists. Bruen, the son, had the entire confidence of his father, as the powers of attorney show. If the words, " any and every, &c." do not mean what we say, they mean nothing. " Any" means " some"— every" takes in all, and what does " other" mean? 3 Camp. 220

What was the construction that Bell and Grant placed upon it? Their letter shows, and if defendant thought it was not the correct one, he ought so to have informed them.

As to the legal construction, 12 East, 227, says, words must be taken as strongly against the party giving the guarantee as the case will admit. See also, 2 Meriv. 280.; 6 Binn. 244.; 12 Wheat. 517; 7 Peters, 113; 10 Peters, 492; 16 Peters, 528, 536; 12 East, 237; 2 Campb. 413; 1 Metcalf, 225; 12 East, 227; 6 Bingh. 244; 6 Meeson and Wilsby, (Exchequer,) 605; 3 Campb. 220; 2 Campb. 39.

The court erred in determining the question, absolutely; as a

question of law, and declaring that the other circumstances did not allow of an extended view of the guarantee. If these circumstances were admitted, their effect was for the jury.

*Choate*, for defendant, made the following points:

1. That the defendant's letter of April 21, 1831, was a contract, preceded by a recital, and that the engagement extends no further than the recital.

2. The recital introduces in direct terms, or by reference, the entire arrangement made between plaintiffs and Thorn, by the letters of the 23d of February, 1831, and March 22, 1831; and the words "this credit," in the defendant's letter of 23d April, 1831, mean the first £2000; and the words "and any and every other credit," mean the subsequent credits, to be opened under the same arrangement.

3. The court will adopt the construction which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties, and this requires the adoption of the defendant's construction.

4. The plaintiffs never relied upon this guarantee for the credits, the subject of this suit.

5. They gave no such notice to the defendant, of the opening of the credits, which are the subject of this suit, as is required to charge the defendant.

6. They did not, within a reasonable time after the grant of the credits, and after the bills were paid, demand payment of the defendant, or give him notice that they looked to him.

7. The original arrangement made between the plaintiffs and Thorn, in March, 1831, was subsequently, in the spring of 1834, abandoned and deserted; and in the autumn following, a new and inconsistent one, enlarging the credits to be given, and diminishing the security, was made, rendering notice to the defendant necessary, but to which no notice could have given legal effect to charge the defendant for subsequent credits.

8. The apparent diversity of terms between the recital and the engagement in the defendant's letter, raises a doubt upon the face of the guarantee as to its true extent; and upon that doubt, thus raised, the construction will be in favour of the surety.

Mr. Choate then discussed the two constructions to be placed upon the letter. There is no proof that Bruen, the son, was a partner.in the house. Record only says, "interested and conversant." He might have had a contingent salary. If he was a partner, there is no proof that defendant knew it.

In March, 1834, the arrangement was abandoned, and in the following·October, the plaintiffs and Thorn made a new one.

In October, 1836 and 1837, plaintiffs made another arrangement with Thorn, opening credits for $50,000. In April, 1837, Thorn failed, and in June, 1837, Bell became embarrassed; and yet the defendant was not notified until 1839.

As to the letter of 23d April, its language must be limited by the recital and the circumstances. Sheph. 86. Courts habitually so limit instruments. 1 Domat, 248; 3 Ch. Cases, 101; Sheph. 76; Bac. Abr. title "Fait;" 9 Mass. Rep. 235; Theobald on Surety, 66; 1 Law. Lib. 39..

Condition, when larger than the recital, is limited by it. Fell on Guarantees, 116; 1 Williams's Saunders, 415, note; Aleyn, 10; 1 Strange, 227; 2 Saunders, 412, a leading case; 6 East, 507; 2 Smith, 655; 2 New Rep. 175, referred to in Fell, 125; 2 Barn. and Ald. 431; 2 Maule and Sel. 363; 4 Taunt. 593.

Reason of the rule is, that it is supposed to reach the true meaning of the parties, as it is more likely that men will use language improperly than act foolishly. Hobart, 304; Sheph. Touch. 86.

So in the civil law; the court looks to probability. 1 Domat, 248. So in 16 Peters, 534, reference is had to the circumstances of the case. 12. Wheat. 518; 2 Pick. 235; 17 Wend. Rep. 425; 1 Metcalf, 25; 8 Taunt. Rep. 208.

Reason is stronger in the case of a surety. He is a favourite of courts, and his contract is *stricti juris.* Where the terms are clear, they are not to be extended; where they are·doubtful, the court will adopt the narrower sense, provided it be reasonable and probable. Pothier on. Oblig. p. 2, c. 6, s. 4; Code Napoleon, tit. 14, c. 1,.arts. 2011, 2015, p. 401; 7 Cranch, 90, never repealed; 7 Peters, 122, does not conflict.with· it, but adopts it. 1 Mason, 336, that the language should·be strong to make a continuing guarantee; in case of doubt, construction in favour of surety; 16 Peters, 537; Ludlow *v.* Simonds, 2 Caines's Cases in

Error, 1; 10 Johns. Rep. 311, 325; 8 Wend. 516; 17 Wend. 422; 2 Pick. 224.

The law in England is so now.   In the cases cited on the other side, there is a plain meaning against the surety.'  1 Starkie, 192; 8 Taunt. 224; 3 Barn. and Ald. 594, 595; Nicholson and Paget, 52; 6 Mearn, (Exchequer Reports,) 613; 1 T. R. 287; 2 T. R. 370; 3 East, 484; 8 Moore, 588, 582; 1 Perry and David-son, 249; 10 Ad. and Ellis, 30.

This letter is a contract preceded by a recital of the circum-stances.   A recital is a prefatory statement to make the mean-ing plain.   The purpose of the credit is stated, and the writer must have referred to the renewed credit.   2 Bos. and Pul. 238. There is only one case carrying the engagement beyond the reci-tal, and that is 2 Campbell, N. P. Rep. 39.   But that was differ-ent from the present case, the engagement there being for any thing "due on any other account," and inconsistent with the re-cital; but here it is not.   No one asked defendant for an unlimited guarantee.   Conduct of plaintiffs *not likely to excite suspicion,* because they merely echoed defendant's own letter.

The plaintiffs ought to have notified defendant when they opened new credits.   5 Peters, 624; 12 Peters, 213; 4 Greenl. 525; 22 Pick. R., 223; 17 Johns. 140.   Notice of default, at all events, is indispensable.    14 Pick. 353; 18 Pick. 536; 8 Pick. 423; 22 Pick. 223; 3 Wheat. 144; 9 Serg. and Rawle, 202.

The court below was right in deciding the question as a point of law.   1 Peters, 182; 5 Cranch, 190; Paine's C. C. R. 545; 20 Pick. 156.

*Sergeant,* for plaintiffs, in reply, said that he had not had time, since yesterday, to look at all the authorities cited on both sides, there being about one hundred and fifty.   This court have settled the law, in 13 Peters, 89, as to the exclusion or admission of parol evidence of circumstances.   In Moran *v.* Bullitt, 16 Peters, they decided that when there is a valuable consideration, an endorser, though often a mere surety, is governed by the law merchant, and not the common-law rules as to sureties.

1. The written guarantee by itself.

2. As explained by evidence.

1. By itself.  Every letter is written to some one: but does

not bind until accepted by the other party. Then the two letters constitute one contract. If the acceptance varies from the offer, the offering party ought to say so. It is a law of correspondence to speak the truth plainly; and hence, if there be ambiguity, the construction must be against the writer. It may be an intentional trap. The case in 16 Peters turned upon this. Bell and Grant answered the letter, saying what they thought of it; but the charge of the court below was given upon only one of these two letters.

In 2 Campbell, 39, the recital in a bond did not limit the engagement, because it was a commercial transaction. In 1831, Bruen came forward voluntarily. Bell did not ask him nor inquire his motives. A guarantee always implies that the thing would not be done without it. If Bruen intended what we say, he would have used the very words he did. There is no ambiguity, and why construe it in? All the cases except that in Campbell were bonds with collateral conditions. Lord Ellenborough treats them all as bonds given in appointments to office. These are common law instruments, and the recital is put in on purpose to explain. But not so with commercial contracts. There is no recital in a letter or conversation. In the bond cases there is a contradiction, but there is none here.

The jury could have inferred Bruen the son's partnership in Thorn's house. He was interested in " the business." What business? Bruen, from bankruptcy, had become worth £4000 in seven years. The defendant therefore wished to sustain his son.

The question of notice ought to have gone to the jury. Douglas v. Reynolds, 7 Peters, is decisive that notice is a question of fact.

Thorn failed on 10th April, 1837; this dispenses with notice of the default. 12 Peters, 213.

Mr. Justice CATRON delivered the opinion of the court.

The original action was founded upon a guarantee given by Matthias Bruen to Bell and Grant, in favour of Wm. H. Thorn, by the following letter:

*New York, 23d April, 1831.*

MESSRS. BELL AND GRANT, *London.*—DEAR SIRS:—Our mutual friend, Mr. Wm. H. Thorn, has informed me that he has a credit for £2000, given by you in his favour with Messrs. Archias

and Co., to give facilities to his business at Marseilles. In expressing my obligations to you for the continuation of your friendship to this gentleman, I take occasion to state, that you may consider this, as well as any and every other credit you may open in his favour, as being under my guarantee.

I am, dear sirs, your friend and servant,          M. BRUEN.

To this letter the following answer was· given by Bell and Grant:

*London, 14th June,* 1831.

MATTHIAS BRUEN, Esq., *New York.*—We are in the receipt of your favour of the 23d .April, guarantying the credit opened on behalf· of Mr. Wm. H. Thorn with Messrs. Archias and Co., of ˙Marseilles, for· £2000, for the purpose· of facilitating˙ his business with that place; and, moreover, desiring us to consider as under your guarantee, also, all credits existing, or that we may hereafter open for said friend, of which we take due note. And we trust, that ·Mr. Thorn, as well as your good self, will have every reason to be satisfied with the confidence which we feel a· pleasure in assigning to both of you."

The declaration contains four counts:

1. That the plaintiffs, on the 31st of March, 1836, were requested by Thorn to open a credit in his favour, authorizing the firm of La Cave and Echicopar, of Cadiz, to draw on the plaintiffs to the extent of £2500. That on the 22d November, 1836, La C. and E. drew for £385: which was advanced on the 12th February, 1837, by the plaintiffs, according to Thorn's request.·

2. That on the 10th of October, 1834, at the· request of Thorn a credit was opened in his favour, authorizing R. Anderson and .Co., of Gibraltar, to.draw for £4000. On the 16th December; 1834, Anderson and Co. drew for £318 12s. 6d.: which ·plaintiffs paid, 19th March, 1837.

3. That on the 15th of August, 1836, the plaintiffs .opened a credit in favour of Thorn, authorizing Amac,· Zipcey˙and .Co., of Smyrna, to draw for £3500. Of this sum, the house at Smyrna drew £1640: which plaintiffs paid, 8th April, 1837..·

4. That· on the 8th March, 1837, plaintiffs opened a credit to Thorn, himself, for £3500, for which amount he drew· bills; and which were paid, 17th June, 1837.

Much other correspondence and evidence was ·given to the

Q

jury, that need not at present be referred to; but which appears in the statement of the case made out by the reporter, and presented to us.

The evidence being closed, the defendant prayed the Circuit Court to instruct the jury, as matter of law, that the letter of guarantee, of April 23d, 1831, was confined to credits to be opened to the house of Archias and Co., or other houses with whom Thorn might deal at Marseilles; and therefore the plaintiffs could not recover from the defendant, the advances made upon the bills of exchange given in evidence: being for the sums paid, as stated in the four counts of the declaration.

Thereupon the court did decide, as matter of law, "that by the true construction of the said letter of guarantee, of April 23d, 1831, the same only embraced credits which should be opened for account of Wm. H. Thorn to the house of Archias and Co., of Marseilles; and that the evidence of the other matters in this behalf proved, did not give the said letter of guarantee a more enlarged application. And therefore, that the jury ought to find a verdict for the defendant."

The jury found accordingly: and it is this instruction of the court alone, that we are called upon to examine, and revise. Does the letter of guarantee extend to, and cover the debts of Wm. H. Thorn sued for? is the question. It was an engagement to be executed in England, and must be construed and have effect, according to the laws of that country. Bank of the United States *v.* Daniel, 12 Peters, 54, 55. But it is necessary to remark that the law governing the agreement is the same in this country and in England: had it been made between merchants of different states of this Union, and intended to be executed at home, the same rules of construction would be adopted; and the same adjudications would apply.

It is insisted for the plaintiffs, that the Circuit Court erred in determining the question absolutely as a question of law, upon the construction of the letter: that it also erred in declaring the other circumstances did not allow of an application of the guarantee to the transactions in question: such other circumstances, being admitted, their effect on the extent and application of the guarantee was for the jury; and by deciding on their effect as matter of law, they were withdrawn from the jury.

Bell et al. *v.* Bruen.

The letter of Bruen was an agreement to pay the debt of another on his making default : by the statute of frauds, (29 Chs. 2,) such agreement must be in writing, and signed by the party to be charged : it cannot be added to, by verbal evidence ; nor by written either, if not signed by the guarantor, unless the written evidence is, by a reference in the letter, adopted as part of it.

But as the statute does not prescribe the form of a binding agreement, it is sufficient that the natural parts of it appear either expressed, or clearly to be implied : and correspondence and other evidence may be used to ascertain the true import and application of the agreement ; by the aid of which extrinsic evidence, the proper construction may be made. Such is the doctrine of this court, as will be seen by reference to the cases of Drummond *v.* Prestman, 12 Wheat. ; Douglass *v.* Reynolds, 7 Peters ; Lee *v.* Dick, 10 Peters.

In the present instance, the question having arisen, and construction been called for, the matters referred to in the letter of the defendant, were considered ; (as circumstances attending the transaction,) to aid the court in arriving at a proper understanding of the engagement : so soon as it was understood, its construction belonged to the court, and was, "matter of law," within the general rule applicable to all written instruments. It rested with the court to decide, whether the guarantee extended to, and covered the credits set forth in the declaration : and was the common case of asking the court to instruct the jury, that the plaintiff had not proved enough to entitle him to recover, admitting all his evidence to be true. In England, the same end is attained, by moving for a nonsuit.

For the defendant it is contended : That the letter of April 21, 1831, is a contract, preceded by a recital, and that the engagement extends no further than the recital.

The recital introduces in direct terms, or by reference, the entire arrangement made between plaintiffs and Thorn, by the letters of the 23d of February, 1831, and March 22, 1831 ; and the words "this credit," in the defendant's letter of 23d April, 1831, mean the first £2000 ; and the words "and any and every other credit," mean the subsequent credits, to be opened under the same arrangement.

The general rule is well settled in controversies arising on the

construction of bonds, with conditions for the performance of duties, preceded by recitals; that where the undertaking is general, it shall be restrained, and its obligatory force limited within the recitals. The leading case, is Arlington *v.* Merricke, 2 Saund. R. 403. It has been followed by many others: Liverpool Waterwork Co. *v.* Harpley, (6 East, 507;) Wardens, &c. *v.* Bostock, (2 Bos. and P. 175;) Leadley *v.* Evans, (2 Bingh. R. 32;) Pepin *v.* Cooper, (2 Barn. and A. 431,) are some of the principal cases affirming the rule.

Where a mercantile guarantee, is preceded by a recital, definite in its terms; and to which the general words obviously refer, the same rule applies, of limiting the liability, within the terms of the recital, in restraint of the general words. We find the courts constantly referring to the cases arising on bonds with conditions, for the rule of construction, and applying it to commercial guarantees; the most approved text writers on this subject do the same: does the engagement before us fall within the rule? It recites:

"Our mutual friend, William H. Thorn, has informed me that he has a credit for two thousand pounds, given by you in his favour with Messrs. Archias and Co., to give facilities to his business at Marseilles." The agreement is: "I take occasion to state, that you may consider this, as well as any and every other credit you may open in his favour, as being under my guarantee."

We are of opinion that the engagement should be construed as if it read—"You may consider *this*, credit with Archias and Co., as being under my guarantee: as well as, any and every other credit, you may open in favour of William H. Thorn with any and every other person, as also being under my guarantee." And that therefore the first branch of the undertaking has reference to the recital; and that the latter part, is independent of it. To hold otherwise, would reject the general words—"as well as any and every other credit"—as unmeaning and useless: the agreement having the same effect, by the construction claimed for the defendant, if these words were struck out, as if they are left in it.

The general words, it is insisted, related to the character of the credit opened with Archias and Co., because it was an open and continuing credit, for £2000. That this appears by the letters

of Thorn to Bell and Grant, and to Archias and Co.; which are sufficiently referred to in the recital of the letter to make them part thereof, and to extend it to the continuing credit with Archias and Co.

That the two letters of Thorn were sufficiently referred to, and could be read to establish the nature of the credit; and that it was open, we have no doubt; but their adoption was just as certain without the general words, as with them. The special reference to the recital, adopting it as explained by the letters, leaves the general words still without meaning unless the guarantee extends beyond the credit opened with Archias and Co.

To make a proper application of the general words, it becomes necessary to lay down a definite rule of construction applicable to them; as the authorities are in conflict, and to say the least, in considerable confusion, on the subject. The arguments are in direct conflict.

For the plaintiffs in error, (Bell and Grant,) it is contended: "That the guarantee by letters is to be taken, in case of doubt, or ambiguity, on its face or otherwise, in the broadest sense, which its language allows, and in which it has been acted on by the parties." Drummond v. Prestman, (12 Wheat.;) Douglass v. Reynolds, (7 Peters;) Dick v. Lee, (10 Peters;) Mauran v. Bullus, (16 Peters;) Mason v. Pritchard, (12 East;) Merle v. Wells, (2 Campb. R. 413;) Bent v. Hartshorne, (1 Metcalfe R.;) Hargreave v. Smee, (6 Bingh. R.; 10 Eng. Com. Law Rep. 69;) Mayer v. Isaac, (6 Mees. and Wels. Exch. R.;) and Bastow v. Bennet, (3 Campb. R.) are relied on, to support the construction claimed as the true one.

On part of the defendant, (Bruen,) it is insisted, "That the apparent diversity of terms, between the recital and the engagement in the defendant's letter, raises a doubt upon the face of the guarantee as to its true extent; and upon the doubt, thus raised, the construction will be in favour of the surety.

The following authorities are relied on to sustain the construction here claimed: Pothier on Obligations, part 2, sec. 34; Code Napoleon, art. 2011, 2015; Russell v. Clarke, 7 Cranch; 1 Mason, 336; 2 Caines's Cases in Error, 29, 49; 10 Johns. R. 180, 325; 8 Wend. R. 516; 7 Wend. 422; 2 Pick. R. 234; 16 Peters, 537; 1 Stark. R. 192; 8 Taunt. 224; 3 B. and A. 594, 595; 1 Crompt. and Mees. 52, 54; 3 Wilson, 530; 1 Term R. 287; 2 So. 370;

3 East, 484; 4 Taunt. 673; 8 Moore, 588; 1 Perry and D. 249; 10 Adolph. and Ellis, 30.

The adjudged cases referred to, giving a construction to bonds with conditions, and contracts made directly between debtor and creditor, afford little aid in arriving at the true understanding of a commercial guarantee. Bonds, &c., are entered into with caution, and often after taking legal advice; they contain the entire contract, beyond which the courts rarely look for circumstances to aid, in their construction. And if there be sureties bound by them, and the meaning is doubtful, the construction is restricted, and made most favourable to the sureties. Such is the result of the authorities cited for the defendant.

On the other hand: letters of guarantee are (usually) written by merchants; rarely with caution, and scarcely ever with precision; they refer in most cases, as in the present, to various circumstances, and extensive commercial dealings, in the briefest, and most casual manner, without any regard to form; leaving much to inference, and their meaning open to ascertainment from extrinsic circumstances, and facts, accompanying the transaction: without referring to which, they could rarely be properly understood by merchants, or by courts of justice. The attempt, therefore, to bring them to a standard of construction, founded on principles, neither known, or regarded, by the writers, could not do otherwise than produce confusion. Such has been the consequence, of the attempt to subject this description of commercial engagement to the same rules of interpretation applicable to bonds, and similar precise contracts. Of the fallacy of which attempt, the investigation of this cause has furnished a striking, and instructive instance. These are considerations applicable to both of the arguments.

The construction contended for as the true one on part of the plaintiffs, is, That the letter of the defendant must be taken in the broadest sense which its language allows; thereby, to widen its application. To assert this as a general principle, would so often, and so surely, violate the intention of the guarantor, that it is rejected. We think the court should adopt the construction which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties. In the language of this court, in Douglass v. Reynolds, 7 Peters, 122,

"Every instrument of this sort ought to receive a fair and reasonable interpretation according to the true import of its terms. It being an engagement for the debt of another, there is certainly no reason for giving it an expanded signification, or liberal construction beyond the fair import of the terms." Or, it is, "to be construed according to what is fairly to be presumed, to have been the understanding of the parties, without any strict technical nicety;" as declared in Dick *v.* Lee, 10 Peters, 493. The presumption is of course to be ascertained, from the facts, and circumstances accompanying the entire transaction. We hold these to be the proper rules of interpretation, applicable to the letter before us.

The general words not being restricted by the recital, they fairly import that Matthias Bruen was bound to Bell and Grant for the credits they opened in favour of William H. Thorn with Archias and Co.: and for the credits also, they opened in favour of Thorn, with any and every other person; covering those set forth in the three first counts in the declaration: and we think that the Circuit Court erred, by instructing the jury to the contrary.

Whether the guarantee covered the credit extended to Thorn himself, directly, it is not thought necessary to inquire; as no argument was founded on such an assumption; Thorn, who was introduced as a witness in the Circuit Court by the plaintiffs, on his cross-examination declared, that the £3500, mentioned in the last count in the declaration, "had no relation whatever to the guarantee of the defendant:" it being under the guarantee of a different person.

It was insisted also: That when Thorn failed, and the dealings between him and the plaintiffs ceased, they were bound to notify the guarantor, of the existence of the debts due them by Thorn, and for which Bruen was held liable, in a reasonable time after the dealings ceased: that Thorn failed April 10th, 1837; and the notice was not given until December 31st, 1838; the debts sued for in the three first counts of the declaration being then due: therefore the notice was too late, and the defendant discharged.

The record shows that this ground of defence was not brought to the consideration of the Circuit Court: we do not therefore feel ourselves at liberty to express any opinion upon the question.

Again it is insisted: The original arrangement made between the plaintiffs and Thorn, in March, 1831, was subsequently, in the spring of 1834, abandoned and deserted; and in the autumn following, a new and inconsistent one, enlarging the credits to be given, and diminishing the security, was made, rendering notice to the defendant necessary, but to which no notice could have given legal effect to charge the defendant for subsequent credits.

To this, and all other questions raised here, on which the court below was not called to express any opinion, we can only give the same answer, given to the next preceding, supposed ground of defence.

It is ordered, that the judgment of the Circuit Court be reversed, and the cause remanded for another trial thereof.

## ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the southern district of New York, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby reversed, with costs; and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to award a *venire facias de novo*.