## GREAT NORTHERN RY. CO. v. HOOKER.

(Circuit Court of Appeals, Eighth Circuit. May 24, 1909.)

No. 2,799.

1. MASTER AND SERVANT (§ 243*)—RULES—OBEDIENCE BY SERVANT.

When the duties of a servant in given circumstances are plainly specified in reasonable rules of the master, of which the servant has knowledge, his nonobservance of them at a time when they are capable of observance is negligence as matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 682, 759–775; Dec. Dig. § 243.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MASTER AND SERVANT (§ 284*)—RULES—INTERPRETATION BY COURT.

When the printed rules of the master, specifying the duties of a servant in given circumstances, contain no terms which are not made plain by the rules, their interpretation falls within the general rule that the interpretation of a written instrument is a question of law for the court, and not a question of fact for the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 284.*]

3. RAILROADS (§ 316*) — CROSSINGS — CARE REQUIRED — SPEED—"UNDER CONTROL."

The rules of a railroad company required an engineer in approaching stations to do so with his train "under control," and so to proceed until the track was "plainly seen to be clear," and then, after providing that engines, freight trains, and work trains might occupy the main track between the outside switches at a designated station, declared that the responsibility for a collision within those limits would rest "entirely" with the approaching train. *Held*, that such rules plainly required an engineer in approaching those limits and proceeding therein in the nighttime, to adjust his control over his train to the distance he could see along the track as he advanced thereon, so that, if the track was already occupied at any point, he could stop his train and avoid a collision after that point came within the range of his observation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1006–1008; Dec. Dig. § 316.*

For other definitions, see Words and Phrases, vol. 8, p. 7158.]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of North Dakota.

C. J. Murphy (Fred S. Duggan, on the brief), for plaintiff in error.
George A. Bangs (C. C. McElwee, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge. This was an action to recover for personal injuries sustained in a collision on the railroad of the Great Northern Railway Company, and one of the questions to be considered is whether or not the evidence was such as reasonably to admit of no other conclusion than that the plaintiff disregarded the rules prescribing his duties in the premises, and thereby was guilty of negligence which proximately contributed to his injuries. In that view of the evidence which is most favorable to him, and yet is reasonably permissible, these are the facts: The collision occurred within the station or yard limits at Lakota, N. D., in the early evening, while it was dark. Forty-seven cars of an east-bound freight train, extra 1200, were, and for three hours had been, standing upon the main track between the outside switches, and the engine and other cars were in another part of the yard, where one of the cars was being repaired. In that situation, the rules of the company required that certain signal lights be displayed upon and about the cars upon the main track to give warning of their presence at that place; but compliance with that requirement was neglected by those in charge of the train, and their negligence was attributable to the railway company under the state statute.

The plaintiff was the engineer on a west-bound freight train, extra 1124, and knew that his train would meet extra 1200 at Lakota. As he approached that station, and when he was about a mile and a half away, he observed the headlight of an engine upon a side track within the station or yard limits, and after a brief time the headlight ceased to be observable. Thereupon he assumed that it was the headlight of extra 1200, that that train had been turned out from the main track to permit his train to pass thereon, and that thereupon the headlight had been hooded and thereby concealed, both of which acts should, and probably would, have been performed, if it had not been necessary, in the circumstances, to leave a part of extra 1200 upon the main track while one of the cars was being repaired upon another track. But, in truth, that train had not turned out from the main track, only the engine and a few of the cars being on a side track, and the headlight had not been hooded, but had ceased to be observable because the plaintiff's view of it was cut off by some cars standing on an intermediate track. In approaching the station or yard limits he slackened the speed of his train somewhat, but not enough, or approximately enough, to enable him to bring it to a stop within such distance as he could look ahead and see that the track was clear. On the contrary, he proceeded within the station or yard limits at such a speed that, although he was looking ahead carefully, although the appliances for stopping his train were in good working order, and although, when the cars standing upon the main track came within the range of his vision, he did all that could be done to stop his train, a severe and destructive collision ensued. Shortly thereafter he sent in a written report wherein he estimated that his train was moving "15 to 18 miles per hour," and the immediate results of the collision confirm that estimate. Both trains were regular ones, which were more than 12 hours behind their schedule time, and were proceeding under train orders, as provided in rule 44, which was as follows:

"Regular trains twelve hours behind their schedule time lose both right and class, and can thereafter proceed only by train order."

The order under which the plaintiff's train was proceeding, of which he had a copy, read as follows:

"Eng. 1124 will run extra Michigan to Devil's Lake ahead of No. 403 and meet extra 1200 east at Lakota."

On a time-table carried by the plaintiff was this special rule, with which he was familiar:

"At the following named stations, engines, freight trains, and work trains may occupy main track, and block signals will be operated as per block signal rule No. 16: Lakota."

The plaintiff was an experienced engineer upon that part of the defendant's road, knew the location and extent of the station or yard limits at Lakota, knew his relative position to them as he was approaching, and was familiar with the rules prescribing his duties in the premises. Those rules were as follows:

"Rule 53. All trains must approach all stations, and water tanks between stations, under control, and so proceed until the track is plainly seen to be

clear. The responsibility for a collision at a station, or at a water tank between stations, will rest with the following or incoming train. This will not relieve train and enginemen from the responsibility of protecting trains at stations and water tanks as provided by rules 49 and 57."

The two rules so designated and block signal rule 14 required that certain signals be displayed upon and about trains and cars situated as was that part of extra 1200 which was upon the main track.

"Rule 69. When within the limits of the various yards all trains must be run with great care, and under control of the engineman.

"Switching engines will have the right to work upon the main track without special orders, within yard limits, upon the time of all except first-class [passenger] trains, but must clear the track immediately upon their arrival."

"Rule 81. In all cases of doubt or uncertainty, take the safe course and run no risks."

"Rule 223. The engineman is jointly and equally responsible with the conductor for the safety of his train and the movement of the same in strict compliance with the rules, and he must decline to obey any orders which involve peril to his train or violation of the rules."

"Block Signal Rule 16. Each division will specify important stations * * * under 'special rules' on time-table, where engines, freight trains, and work trains may occupy the main track between the outside switches, except upon the time of regular passenger trains. The engines, freight trains, or work trains may be reported as having arrived at such stations when they are between the outer switches, providing block signalman has been notified by the conductor; and block signalman at adjoining stations may then give clear signal to any approaching train, except passenger train. The responsibility for an accident between outside switches of stations so specified will rest entirely with the train approaching said limits."

At the adjoining station a clear block signal was given to the plaintiff, which he rightly understood as meaning that the track was clear to Lakota, subject to the qualification in block signal rule 16 relating to the occupancy of the main track between the outside switches. As his train was approaching Lakota, the light at the east switch was green, and he rightly understood therefrom that the switch was lined up for the main track, and not the side track. The switching and yard work at that station was done by train engines and crews, no switch engine or crew being maintained there; and when a train engine was so engaged it usually was separated from the major part of the train. The plaintiff knew that that was so, and was expecting to stop on the main track at a point considerably west of where the collision occurred, and then to transfer some of the cars of his train to a side track in that way. He was not induced to proceed as he did by any false or misleading signal, for none such was given.

These facts, in our opinion, reasonably admit of no other conclusion than that the plaintiff disregarded the rules prescribing his duties in the premises, and thereby was guilty of negligence which proximately contributed to his injuries. The train order under which he was proceeding advised him that extra 1200 would be at Lakota, and the rules further advised him that it might be occupying the main track between the outside switches. That alone would have imposed upon him the duty of exercising great care in approaching and passing through the station or yard limits; but the rules did not leave the matter there. In express terms they laid upon him the duty of having his train "under control" in approaching those limits, and of

so proceeding until the track was "plainly seen to be clear," and then, as if to avoid any possible uncertainty as to his duty in the premises, it was declared that the responsibility for a collision between the outside switches would rest "entirely" with his train. This plainly meant that his control should be adjusted to the distance he could see along the track as he advanced thereon—that is, should be such that, if the track was already occupied at any point, he could stop his train and avoid a collision after that point came within the range of his observation; otherwise, it would not have been said, as in substance it was, that his control should be maintained until the track was "plainly seen to be clear," and that he should proceed on the theory that the responsibility for a collision would rest "entirely" with his train. True, other rules laid upon others the duty of displaying signal lights upon and about the cars upon the main track; but that did not relieve him of the duty so plainly laid upon him, or justify him in treating the absence of such signal lights as an assurance that the track was clear. On the contrary, the rules show that these duties were distinctly and separately imposed in a manner which prevented either from qualifying or lessening the other; the purpose being to provide for double or cumulative precautions against a collision. The plaintiff, although familiar with the rules applicable to him, did not have his train under control, but proceeded between the outside switches at a speed whereby he took chances upon the track being clear for a considerable distance beyond the range of his observation. The rules were reasonable and capable of observance, and, had he observed them by having his train under control, the collision would have been avoided. It follows that his nonobservance of them was negligence as matter of law. Kansas, etc., Co. v. Dye, 70 Fed. 24, 16 C. C. A. 604; St. Louis & S. F. Ry. Co. v. Dewees, 153 Fed. 56, 82 C. C. A. 190; Missouri, K & T. Ry. Co. v. Collier, 157 Fed. 347, 88 C. C. A. 127; Nordquist v. Great Northern Ry Co., 89 Minn. 485, 95 N. W. 322; Scott v. Eastern Ry. Co., 90 Minn. 135, 95 N. W. 892; Brown v. Northern Pacific Ry. Co., 44 Wash. 1, 86 Pac. 1053.

It is said that it was an admissible conclusion from the facts before recited that the plaintiff was justified in assuming that extra 1200 had turned out from the main track to permit his train to pass thereon, and therefore was justified in proceeding as he did. But the contention overlooks the binding force of the rules. The plaintiff was not at liberty to regulate his actions according to his own ideas of what prudently could be done, or according to mere probabilities or inferences drawn from the surroundings, but was required by the rules to proceed with his train under control until he plainly saw that the track was clear. It was foreseen that collisions likely would ensue if engineers were free to proceed, each according to his own judgment, in such situations, and therefore a fixed and safe course of action was prescribed for all. As particularly apposite we quote from Louisville & N. R. Co. v. Mothershed, 110 Ala. 143, 153, 20 South. 67, 69, where, in considering the obligatory effect of a like rule, it was said:

"The end and obvious tendency of its promulgation and enforcement was the all important one of avoiding great peril of life and property. The high-

est considerations of duty to its employés, the general public, and itself impelled the defendant to its adoption. Being promulgated, and no unforeseen emergency arising which would render obedience to it in a given case impracticable or disastrous, all discretion as to the necessity of obedience was exhausted. The engineer having the means of observance, the rule was mandatory upon him. He had no right to inquire whether the surroundings seemed to render obedience necessary. It matters not, therefore, whether his disobedience was expressly willful, or inadvertent, or resulted from a reasonable belief, in his mind, that in the given instance obedience was unnecessary. He was equally culpable in either event."

And to the same effect is Simpson v. Central Vermont R. Co., 5 App. Div. 614, 617, 39 N. Y. Supp. 464.

In the same connection it is also insisted that the plaintiff, after seeing the engine of extra 1200 upon a side track, was justified in assuming that no part of that train was occupying the main track, because block signal rule 16, although permitting "freight trains" to occupy that track, did not permit it to be occupied by the cars of such a train when detached from the engine. But the rule was not so restricted in its meaning. It manifestly was intended to facilitate switching and yard work at particular stations, such as Lakota, by according to the trains charged with that work greater freedom and protection in respect of the occupancy of the main track; and, this being so, it reasonably is certain that it was intended to sanction the occupancy of that track by that portion of the train which usually was at rest and detached from the engine while it was temporarily engaged in that work. The plaintiff's asserted justification is predicated upon the assumption that he was not required to anticipate the presence at Lakota of any train other than extra 1200, and, for the purposes of the present discussion, we have given effect to this assumption, without stopping to consider whether or not, in view of the rules, it is well grounded.

The trial court treated the interpretation of the rules prescribing the plaintiff's duty in the premises as a question of fact to be determined by the jury. But we are of opinion that it was a question of law to be determined by the court. Not only were the rules in the nature of a written instrument, but they contained no terms the meaning of which was not made plain by them; and, this being so, effect should have been given to the general rule that the interpretation of a written instrument rests with the court, and not with the jury. Bell v. Bruen, 1 How. 169, 183, 11 L. Ed. 89; Goddard v. Foster, 17 Wall. 123, 143, 21 L. Ed. 589; Higgins v. McCrea, 116 U. S. 671, 682, 6 Sup. Ct. 557, 29 L. Ed. 764; Scanlan v. Hodges, 52 Fed. 354, 3 C. C. A. 113; Bowes v. Shand, L. R. 2 App. Cas. 455; 1 Labatt, Master and Servant, § 215. Moreover, it is held by this court that the reasonableness of such rules it is to be determined by the court as a question of law, and not by the jury as a question of fact. Kansas, etc., Co. v. Dye, 70 Fed. 24, 16 C. C. A. 604; Little Rock, etc., Co. v. Barry, 84 Fed. 944, 28 C. C. A. 644, 43 L. R. A. 349. See, also, Scott v. Eastern Ry. Co., 90 Minn. 135, 140, 95 N. W. 892; Bailey's Personal Injuries, § 3325. And it would seem that by analogy a like holding should be made when the question is one of interpretation.

At the conclusion of the evidence the defendant requested that a verdict be directed in its favor, because the evidence reasonably admitted of no other conclusion than that the plaintiff by his own negligence had proximately contributed to his injuries, and it follows from what has been said that the court erred in refusing that request.

The judgment is therefore reversed, with a direction to grant a new trial.