## HIGGINS & Another *v.* McCREA.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

Submitted January 8, 1886.—Decided March 1, 1886.

The rules of a Board of Trade were part of the contract sued on, and authorized plaintiff, who was a member of the board and, as a commission merchant, had bought produce for future delivery on account of defendant, to offset and settle such trade by other trades made by plaintiff, and to substitute some other person for the one from whom he purchased the property. Acting under this rule plaintiff released the seller from his contract, and, having many similar transactions in his business, proposed to himself to substitute in the place of the contract with seller, the agreement of such other contractor as might be available for the purpose at the time of settlement, but designated no particular contractor or contract: *Held,* (1) That it was a question of law for the court whether this was a substitution within the meaning of the rule : (2) That an instruction to the jury upon these facts that there had been no valid substitution of other contracts for those which were cancelled and plaintiff could not recover was correct.

In Ohio the validity in law of a counter-claim by defendant depends upon the allegations respecting it, without regard to allegations and admissions of the

pleadings on the other side in regard to plaintiff's cause of action, and if defendant avers that the counter-claim is founded upon a transaction which the law forbids and makes a crime, it cannot be maintained, even if plaintiff, in setting forth his cause of action founded on the same thing, avers the transaction to be legal.

The plaintiffs in error were the plaintiffs in the Circuit Court. They brought this action to recover $31,644.31, and interest, for moneys paid by them, as they alleged, in executing the orders of the defendant for the purchase, in May, 1883, of certain lots of pork and lard in the Exchange of the Chicago Board of Trade, to be delivered in the following August. The petition averred that the plaintiffs were commission merchants and members of said Board of Trade, that the transactions out of which the suit arose were governed by the rules of the board, and that the defendant had knowledge of said rules.

The petition then averred, as a first cause of action, that on May 19, 1883, the plaintiffs purchased on the order of defendant, and as his brokers and agents, and for his account, 1,000 barrels of pork and 1,000 tierces of lard, to be delivered in August next, on such day as the vendor might elect. That on August 1, 1883, the property was tendered and payment demanded of the plaintiffs, and, in accordance with the defendant's instructions, and the terms and conditions of their agency, the plaintiffs received the pork and lard, and paid therefor $58,553.34, the price thereof, and $56 for inspection charges thereon; all which the plaintiffs were bound and compelled to do by the terms of the contract and the rules and regulations of the Board of Trade, which constituted a part of the contract of agency between the parties, and of the contract of purchase; that on the same day notice was given to the defendant that the pork and lard had been received and paid for; that he failed to give directions for the disposition of the property, and failed to pay therefor, and plaintiffs thereupon sold the same in the Exchange of the Board of Trade and according to its rules, and received therefor, and credited to the account of the defendant, $42,615.97; that they had previously received from the defendant on that account the sum of $6,631.66, and that the balance due from him and unpaid on account of that

transaction was $9,361.71, with interest from the date of sale.

For a second cause of action the plaintiffs set up transactions in all respects similar to those alleged in the first, namely, their purchase on May 22, 1883, for defendant, on his order, of 2,000 barrels of pork and 2,000 tierces of lard, deliverable in August following; the delivery of the produce on August 1, and the payment therefor by the plaintiffs; its subsequent sale by them at a loss of $21,832.60. By a third count the plaintiffs claimed $450 for commissions in said transactions.

The petition then averred that there was due to the plaintiffs from the defendant, by reason of the premises, the sum already stated, for which they demanded judgment.

The defendant, in an amended answer, averred that the plaintiffs were engaged in carrying on, for themselves and others, gambling transactions in pork, lard, and other commodities on the Chicago Board of Trade; that, being solicited by the plaintiffs, and being desirous himself to gamble and speculate on the prices of pork and lard, he engaged with the plaintiffs in such gambling transactions; that, on May 19, 1883, he directed the plaintiffs to deal for him in pork and lard options to the amounts specified in the plaintiffs' petition; that the plaintiffs did, on or about the 19th of May, 1883, enter into contracts in their own name, but, as they now claim, upon account of this defendant, with certain named persons and firms, to wit, G. C. Eldridge & Company and others; that they did not contract for the actual delivery of any pork or lard whatever, but the pretended purchases were mere options, and that it was the understanding of all the parties to said transactions that no pork or lard should be delivered on the contracts, and that the same should be settled upon the differences between the contract and the market price.

The answer further averred that soon after the making of the contracts the plaintiffs disposed of the same for their own benefit, converted the proceeds to their own use, and released the parties with whom they had made said contracts, and that at no time after June 16, 1883, did the plaintiffs hold any contracts whatever for the account of defendant, but falsely re-

ported to him that they were carrying said contracts for his benefit, and required him, from time to time, to pay, and he did pay, into their hands large sums of money, amounting in the aggregate, with a balance already in their hands due to the defendant, to $19,895, and that in the latter part of June, 1883, the defendant gave the plaintiffs notice that he would no longer participate in said gambling transactions, and that he repudiated the same. The answer also denied that any pork or lard was actually delivered to the plaintiffs on said contracts or that they paid any money thereon for account of defendant, and pleaded in bar the statute of the State of Illinois, which declares option contracts to be illegal and void.

By way of counter-claim the defendant, in his answer, demanded judgment against the plaintiffs for his said advances, amounting in all to $19,895, and averred that this money was paid by him to the plaintiffs to promote and carry on said gambling transactions; that said transactions, being the purchase of option contracts, were forbidden by the statute of Illinois, and were illegal and void; that the said sum was so lost by the defendant to the plaintiffs in the said gambling transactions and option contracts as set forth. The reply of the plaintiffs put in issue the new matter set up in the answer and counter-claim of the defendant.

The issues made by the pleadings were tried by a jury. The bill of exceptions stated that the plaintiffs first offered in evidence section 6 of Rule 26 of the Chicago Board of Trade, which was as follows:

"In case any member of the association, acting as a commission merchant, shall have made purchases or sales by order and for account of another, whether the party for whom any such purchase or sale was made shall be a member of the Board of Trade or otherwise, and it shall subsequently appear that such trades may be offset and settled by other trades made by said commission merchant, he shall be deemed authorized to make such offset and settlement, and to substitute some person or persons for the one from or to whom he may have purchased or sold the property originally: *Provided,* That in case of such substitution the member or firm making the same shall be held

to guarantee to his or their principal the ultimate fulfillment of all the contracts made for account of such principal which have been so transferred, and shall be held liable to such principal for all damages or loss resulting from such substitution."

Frederick F. Gilbert, one of the plaintiffs, was put on the stand as a witness in their behalf, and testified in substance as follows: The plaintiffs actually bought the property mentioned in the petition in pursuance of orders received from the defendant; none of the transactions were made with an understanding that the property was not to be delivered, and the property was delivered to the plaintiffs on the 1st of August, and was received and paid for by them; they notified the defendant of such receipt, and that, unless he took the property and reimbursed the plaintiffs for their advances, the same would be sold for his account; the defendant gave no orders, and consequently the property was sold by the plaintiffs on the Board of Trade and the proceeds of sale credited to his account. The witness produced the checks given to Geo. W. Higgins and others, of whom the property was bought, and stated that these checks were given in payment for defendant's account; that the difference between the purchase and selling price, and the consequent loss to the plaintiffs, was the sum mentioned in their petition.

The plaintiffs' having rested, the deposition of the said Frederick F. Gilbert, taken by the defendant, was offered by him in evidence, in which the witness testified in substance as follows:

Neither Eldridge & Co. nor any other parties with whom the plaintiffs made contracts for the defendant, delivered any pork or lard for him on August 1, or at any time. During the latter part of the month of May and the month of June the plaintiffs cancelled all the contracts they had made for the defendant with Eldridge & Co., and others, for pork and lard, and released them from the performance thereof, but gave the defendant no notice of these facts. The contracts were cancelled by offsetting them with contracts they had made with other parties for the sale of pork and lard, and this was done for the advantage of the plaintiffs and to facilitate their business transactions. When the contracts for the defendant were made with Eldridge & Co. and others, they were entered upon the books of

the plaintiffs, and the books showed that the contracts were made for account of the defendant. But after the contracts made for the defendant were cancelled by the process of offsetting them against other contracts, no contracts were substituted for them by any mark or sign upon the books of the plaintiffs. The substituted contracts were afterwards cancelled by the process of offsetting them against other contracts, and this process was continued as the convenience of the plaintiffs required, but none of the substituted contracts were at any time specially assigned to the defendant on the books of the plaintiffs. The plaintiffs, however, took care to have on hand contracts for the sale of pork and lard equal in quantity to their contracts for the purchase of the same commodities, and it was their purpose and practice to apply the first produce delivered on contracts of sale to the oldest contract of purchase, but the plaintiffs could not tell what produce would be applied to a contract of purchase until it was delivered. There was no special lot in reserve for any one customer. The plaintiffs had the produce coming in. " They aggregated their books and balanced every few days to see whether they had stuff enough coming to fill their contracts." When the produce was delivered to them it was common property, like wheat put in an elevator. Out of 7000 barrels of pork delivered to the plaintiffs on August 1, they applied a sufficient quantity to satisfy the defendant's contracts of purchase. " It did not matter who it came from first, whatever came there first it was reserved for " the defendant. The plaintiffs received and paid for no lard on defendant's account on August 1, or at any other time.

After the cancellation of the contracts made for the defendant by the plaintiffs the latter were the only persons to whom the defendant could look for the pork and lard mentioned in the cancelled contracts. He could hold no one else liable to him for the delivery of the produce.

The pork delivered to plaintiffs on August 1 was delivered, not on contracts made in behalf of defendant, but made for other persons, and all the checks for money paid by the plaintiffs on August 1 were on contracts of purchases made in behalf of other persons and not for the defendant.

The witness further testified that on May 19, 1883, there was standing to the credit of defendant on the books of plaintiffs $1895, and that after that date the defendant paid them on the transactions set out in the petition the additional sum of $18,000.

The deposition of Edward M. Higgins, the other plaintiff, taken in behalf of the defendant, was also introduced in evidence by the latter. So far as it went it was in substance the same as the deposition of Gilbert.

There was conflicting evidence upon the question whether the defendant at the time of the transactions out of which the suit arose knew what were the rules and customs of the Board of Trade.

The defendant, as a witness in his own behalf, testified in regard to his transactions with the plaintiffs as follows:

"I always knew it was gambling. I never bought any property for future delivery and received it, or expected to. I never bought any property, or any pork or lard, or an option, for future delivery and received it. I never intended to receive it. I never intended to receive this or any portion of it. I had no use for it; all I wanted was the difference, if it went my way."

The foregoing is the substance of the evidence necessary to be stated to show the bearing of the charge of the court to the jury.

The bill of exceptions then proceeded to state, that the court, having explained to the jury what would and what would not constitute a gambling contract, said, among other things not excepted to:

"It is legitimate for the parties to make a contract for the delivery of property at some future period, provided they mean a real and *bona fide* contract, and the law recognizes the obligation and will enforce it. If the contract is void for the reason heretofore stated, the plaintiff cannot recover anything, nor could the defendant recover on his cross-action. The law in that contingency would leave the parties in the situation that they have placed themselves in, and no recovery could be had by either plaintiffs or defendant. But if you should be of

opinion that, although the defendant entertained the opinion that it was a gambling transaction, the plaintiffs did not participate in that view of the question, but contemplated and intended an actual purchase, and an actual sale, the contract would be binding between the parties, and it will become your duty to go further and make an additional finding.

"Assuming that this contract was valid and enforcible, the defendant says that he is not bound, for the reason that after the purchases were made by these plaintiffs as his agents, and for his account, they cancelled the contracts and released the vendors therefrom, and that they did that without authority from him, and without his knowledge or his subsequent ratification. Upon that state of facts, if found to be true, the plaintiffs could not recover anything; that cancellation of the contracts and release of the vendors would have absolved the defendant from any obligation to pay the plaintiff for the property so purchased by them for his account. But the plaintiffs in reply say that the Board of Trade has certain rules and regulations, which the court has permitted to be offered in evidence to you, and that under and in accordance with these rules they had a right to cancel these contracts and substitute others in place of them; that these rules were known to and understood by the defendant, and that he, with that knowledge, acquiesced in the cancellation of the contracts, and the alleged substitution of others in the place of those cancelled.

"For present purposes, and without expressing any opinion upon this proposition, the court instructs you that you may, for the purposes of this case, assume that the defendant did know and did consent that these plaintiffs might act under the 6th section of the 26th rule, and that such knowledge and acquiescence of his authorized the plaintiffs to cancel the first contracts and substitute others in their place. But the court instructs you that, assuming plaintiff's contention in this regard to be true, and assuming that the plaintiffs themselves have told the truth in this case, there has been no valid substitution of other contracts for those that were cancelled, and that the plaintiffs cannot, therefore, for that reason, upon their own testimony, recover anything in this action.

"If you find upon that question the original contract to have been valid, and that the defendant is excused or absolved from liability because of this attempted substitution, which the court instructs you was not made in accordance with said rule, then and in that case the defendant will be entitled to recover upon his cross-action against the plaintiffs for all the money which he advanced in pursuance of these contracts."

To the last two paragraphs of the charge the plaintiffs excepted.

The jury returned a verdict in favor of the defendant, and against the plaintiffs, upon the cause of action set forth in their petition, and in favor of the defendant and against the plaintiffs upon the counter-claim set forth in defendant's answer, for the sum of $22,662.42. In accordance with the verdict the court rendered judgment. To reverse that judgment the plaintiffs brought this writ of error.

*Mr. C. C. Bonney* and *Mr. Francis J. Wing* for plaintiffs in error.

*Mr. Stevenson Burke* and *Mr. William B. Sanders* for defendant in error.

MR. JUSTICE WOODS delivered the opinion of the court. After stating the facts as above reported, he continued:

It is not disputed that if the transactions out of which this suit arose were of the character described in the counter-claim and testimony of the defendant, they fell under the ban of section 130 of chapter 38 of the Revised Statutes of Illinois of 1885, page 405, which was in force when the transactions took place. That section, so far as applicable to this case, was as follows: "Whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity, . . . shall be fined not less than $10 nor more than $1000, or confined in the county jail not exceeding one year, or both, and all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

The errors assigned by the plaintiffs relate exclusively to the charge of the court and the rendering of judgment in accordance with the verdict of the jury.

The first complaint made against the charge is that the court withdrew from the jury the question of fact whether the plaintiffs had or had not complied with the rules of the Board of Trade in reference to the substitution of other contracts for those made by them for the defendant, and which they subsequently offset and settled, and charged the jury that certain substitutions of contracts alleged by the plaintiffs to have been made by them were not as matter of law made in accordance with the rules of the Board of Trade.

We think there was no error in the charge of the court complained of. The rule of the Board of Trade upon this subject (sec. 6, rule 26) provides that where purchases or sales shall have been made by a commission merchant, a member of the board, by order or for account of another person, and it shall subsequently appear that such "trades" may be offset and settled by other "trades" made by the same commission merchant, he shall be "authorized to make such offset and settlement and to substitute some person or persons for the one from or to whom he may have purchased or sold the property originally."

The meaning of this rule is plain, namely, that when a commission merchant having made a contract for his principal with a third person, assumes to offset or cancel the contract, he shall substitute therefor another equivalent contract with some other person who shall be bound to his principal for its performance.

It is well settled, as a general rule, that a written contract made by a factor in his own name for the purchase or sale of goods for his principal will bind the principal, and he may sue and be sued thereon exactly as if he were named in it, for it is treated as the contract of the principal as well as of the agent. *Higgins* v. *Senior*, 8 M. & W. 834; *Huntington* v. *Knox*, 7 Cush. 371; *Taintor* v. *Prendergast*, 3 Hill, 72; *Ford* v. *Williams*, 21 How. 287.

The rule of the Board of Trade provided, as has been seen,

that where the commission merchant has substituted one contract for another he shall guarantee to his principal the performance of the substituted contract.

It follows that upon the original contracts made by the plaintiffs for the defendant, the latter, upon their breach, had a right of action against the parties with whom the contracts were made. The purpose of the rule was, therefore, plain, namely, to provide that when contracts were cancelled and others substituted, the commission merchant, as well as the party bound in the substituted contract to sell or buy, should be liable to the other party for its performance. The rule, therefore, does not authorize the commission merchant to release the party to the original contract unless he provides some one else to assume the obligation, or, as the rule states it, "substitute some person or persons for the one from or to whom he may have purchased or sold the property originally."

The only evidence in the case in regard to the cancellation of the original contracts made by the plaintiffs for the defendant and the substitution of other contracts was the testimony of the plaintiffs themselves. They do not contradict each other, and there is no contradiction or impeachment of their testimony on this point in the record. These witnesses make it clear that, after the contracts made by them for the defendant had been offset against others, and thereby cancelled, no other contracts were substituted in their place which the defendant could have enforced. In fact there was no substitution. No contracts were designated to take the place of those cancelled. All that the plaintiffs say on this point is, that it was their purpose to apply the first produce delivered in August on contracts of sale, first to the oldest contract of purchase, and it was uncertain on what contract the first delivery would be made until the delivery actually took place. If there was any substitution of other contracts for the cancelled ones it was only in the mental operations of the plaintiffs, to which no outward expression whatever was given. The plaintiffs admit in their evidence that after the original contracts made for the defendant were offset and released they alone were bound to the defendant, and that there were no other persons against whom

the defendant could have maintained an action. It is plain, therefore, that upon their own showing the plaintiffs did not make the substitution required by sec. 6 of rule 26 of the Board of Trade.

The facts of the case being shown and not disputed, the question whether there had been a valid substitution of contracts under the rule referred to was a question of law. It depended on the construction of the rule, which it was the duty of the court to interpret. *Levy* v. *Gadsby*, 3 Cranch, 180; *Walker* v. *Bank of Washington*, 3 How. 62; *Goddard* v. *Foster*, 17 Wall. 123.

When, therefore, the Circuit Court said to the jury, that, assuming that the plaintiffs themselves have told the truth in this case, there has been no valid substitution of other contracts for those that were cancelled it was merely applying the rule of the Board of Trade as it construed it to the plaintiffs' own version of the facts, and, in so doing, discharged its own duty without invading the province of the jury. It is quite clear, also, from what has been said, that the construction put on the rule by the Circuit Court was correct. We do not see how the rule could have been differently construed. The case, as shown by the testimony, was this: The plaintiffs had been employed by the defendant as his agents to make contracts in his behalf for the purchase of pork and lard. They made contracts under this authority and almost immediately cancelled them, and substituted no other contracts which the defendant could have enforced. There is nothing in the record to show that the plaintiffs were liable to the defendant upon the original contracts made by them for the latter, and there were no substituted contracts on which either the plaintiffs or other persons were liable. The defendant, therefore, on August 1, 1883, had no contract on which he could have demanded the delivery of a pound of pork or lard, or have sustained an action against any one for failure to deliver. The money which the plaintiffs seek to recover in this suit was not, therefore, paid out for the use of the defendant, and an action therefor cannot be maintained against him.

The court would, therefore, have been justified in charging

the jury, that, upon the plaintiffs' own testimony, they were not entitled to a verdict against the defendant upon the cause of action set out in their petition. *Pleasants* v. *Fant*, 22 Wall. 116; *Griggs* v. *Houston*, 104 U. S. 553; *Randall* v. *Baltimore & Ohio Railroad Co.*, 109 U. S. 478. We are of opinion, therefore, that the charge of the Circuit Court, so far as it related to the right of the plaintiffs to recover, was not open to any of the objections urged against it by the plaintiffs.

The next objection made to the charge has reference to that instruction in which the court said: "If you find the original contract to have been valid, and that the defendant is excused or absolved from liability because of the attempted substitutions, which the court instructs you were not made in accordance with said rule, then, and in that case, the defendant will be entitled to recover upon the cross-action against the plaintiffs for all the money which he advanced in pursuance of these contracts." This part of the charge was specifically pointed out by an exception taken by the plaintiffs, to the effect that it allows the defendant to recover, notwithstanding his confession of record that the transactions in which he was engaged with the plaintiffs were gambling transactions, and allows him to recover what he admits were advances made for the purpose of carrying on the business of gambling. We think, therefore, that the record fairly presents the question whether this instruction was right. The Ohio Code of Civil Procedure requires that a cause of action set up as a counter-claim in the answer of the defendant "must be one  .  .  arising out of the contract or transaction set forth in the petition as the foundation of the plaintiff's claim, or connected with the subject of the action." Sec. 94. The counter-claim pleaded by the defendant was within the terms of this section.

A counter-claim under the Ohio Code is regarded as a cross-action. When it has been set up in an answer the plaintiff will not be allowed to dismiss his suit without the defendant's consent, *Wiswell* v. *First Congregational Church*, 14 Ohio St. 31; and it must state facts recognized by courts of law or equity as constituting a cause of action, *Hill* v. *Butler*, 6 Ohio St. 207. If a plaintiff dismiss his action against the defendant,

or fail to appear, that will not prevent the defendant from prosecuting the counter-claim set up in the suit to final judgment against the plaintiff. Code of Procedure, § 373. Rev. Stat. 1880, § 5315.

The court may at any time before the final submission of the cause allow a counter-claim set up in the answer to be withdrawn, and on motion of either party an action on the same shall be docketed and proceeded in as in like cases after process served. Code of Procedure, § 119.

The defendant's counter-claim is, therefore, to be tested by the same rule as if it had been the basis of an independent action, and the question is whether under any circumstances the defendant should have been allowed upon the pleadings and evidence to recover a judgment thereon. The instruction of the court now under review directed the jury, if they found the original contract to have been valid, but the defendant not liable thereon, because the substitution was not made as required by the rules of the Board of Trade, that the defendant was entitled to recover the money advanced by him to the plaintiffs. The verdict of the jury for the defendant on his counter-claim must have been based on a finding that the original contracts were valid and not gambling contracts, and the question is therefore whether the instruction was right, and, if not, whether the error was cured by the verdict of the jury.

We think the charge objected to was erroneous. The cross-action of the defendant, as an independent suit, it is clear, could not have been maintained. His case, as stated by himself in his answer and counter-claim, was that the money was advanced by him to carry on a gambling transaction, that with his concurrence the money so advanced was used in such gambling transactions, and that by the statutes of Illinois, where the contracts were made, they were treated as gaming contracts and declared illegal and void, and the making of them a criminal offence. The counter-claim thus stated was supported by the testimony of the defendant himself, given upon the trial. There was no statute of Illinois to authorize the recovery of money paid on such contracts. The cross-

action, therefore, of the defendant, stated in his pleading and supported by his own deposition, was not one on which any recovery could be had. *Armstrong* v. *Toler,* 12 Wheat. 258; *Brown* v. *Tarkington,* 3 Wall. 377; *Davidson* v. *Lanier,* 4 Wall. 447; *Hanauer* v. *Doane,* 12 Wall. 342. The court was bound to take judicial notice of the fact that the dealings recited in the counter-claim were forbidden by law, and of its own motion should have directed a verdict against the defendant thereon. *Oscanyan* v. *Arms Company,* 103 U. S. 251. If the defendant had withdrawn his counter-claim and docketed it as a separate suit against the plaintiffs, as permitted to do by the code, it needs no discussion to show that his action must have failed. His rights are not changed by the fact that the two causes go on *pari passu,* and are tried at the same time. We do not see on what ground a party, who says in his pleading that the money which he seeks to recover was paid out for the accomplishment of a purpose made an offence by the law, and who testifies and insists to the end of his suit that the contract on which he advanced his money was illegal, criminal, and void, can recover it back in a court whose duty it is to give effect to the law which the party admits he intended to violate.

In the present case the plaintiffs alleged and insisted that their transactions with the defendant were carried on with no unlawful purpose. On the other hand, the defendant alleged and insisted that in the same transactions he intended to violate the law. We see no reason why in such a case the plaintiffs might not, if they had not cancelled the contracts, recover the money paid by them for the defendant, while at the same time the defendant could not recover the money advanced to the plaintiffs for what he intended to be an unlawful purpose.

In *Holman* v. *Johnson,* Cowper, 341, 343, it was said by Lord Mansfield that "the objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the

plaintiff, by accident, if I may so say. The principle of public policy is this *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiffs' own stating, or otherwise, the cause of action appear to arise *ex turpi causâ,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for when both are *equally* in fault *potior est conditio defendentis."*

If, therefore, the defendant intended to embark his money in an illegal and criminal venture, we do not see how his case is helped by the fact that the purpose of the plaintiffs was to invest the money so advanced in what they understood to be a lawful and innocent transaction.

The paragraphs of the charge of the court excepted to amounted in substance to this, that if the plaintiffs, in making the contracts for the defendant, contemplated and intended an actual purchase and an actual sale, but the defendant did not, but, on the contrary, meant to engage in a gambling venture, the contract would, nevertheless, be binding on both parties, and if the plaintiffs cancelled the contracts, the defendant, notwithstanding his intention to violate the laws, could recover from the plaintiffs the money advanced by him to carry out his unlawful purpose. We think this charge was erroneous. Upon the case made by his counter-claim, the defendant was not entitled to recover, and the fact that the plaintiffs were innocent of any unlawful purpose did not enure to the benefit of the defendant, who confessed that the money which he sought to recover had been paid by him to promote an illegal and criminal venture.

Upon the pleadings the verdict of the jury cannot help the defendant's case. Section 5328 of the Revised Statutes of Ohio of 1880 provides " that when upon the statements in the pleadings one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, though a verdict

has been found against such party." It is clear that, upon the defendant's counter-claim, which showed that he had no valid cause of action against the plaintiffs, no valid judgment could be rendered against them. Notwithstanding the verdict, the judgment should have been against the defendant, and for the plaintiffs, upon the counter-claim of the former.

We are of opinion, therefore, that

*The judgment in favor of the defendant on the cause of action alleged in the plaintiffs' petition should be affirmed, and the judgment in favor of the defendant, on the cause of action set up in his answer by way of counter-claim, should be reversed, and the cause remanded with directions to enter a judgment for the plaintiffs and against the defendant on the counter-claim of the latter.*