PARKER et al. v. MOORE.

(Circuit Court of Appeals, Fourth Circuit. May 8, 1902.)

No. 435.

1. CONTRACTS—ACTION FOR BREACH—WHAT LAW GOVERNS.

A contract, although recognized as valid by the laws of the state where made, will in general not be enforced by the courts of another state, where it is contrary to morals or to the public policy or statutes of such state.

2. FEDERAL COURTS—FOLLOWING STATE DECISIONS.

A court of the United States will follow the rule laid down by the highest court of the state in determining whether a contract is governed by the laws of the place where it was made and to be performed or by the law of the forum, and also upon the question whether a contract is contrary to the public policy or statutes of the state.

3. TRIAL—DIRECTION OF NONSUIT—QUESTIONS FOR JURY.

In an action to recover margins advanced by plaintiffs as brokers for defendant on purchases of cotton for future delivery made on defendant's order on the New York Cotton Exchange, where plaintiffs introduced evidence showing that in each case they advised defendant that the purchase was made with the distinct understanding that actual delivery was contemplated, to which he expressed no dissent, it was error to direct a nonsuit, suo motu, based upon the statute of South Carolina, declaring such contracts void unless it was the bona fide intention of both parties at the time the contract was made that the cotton should be actually delivered and received in kind, merely on the self-serving testimony of defendant that it was not his intention to receive the cotton; the question of defendant's actual intention at the time, under such state of evidence, being one for the jury.

4. CONTRACTS—GAMBLING TRANSACTIONS—RIGHT OF BROKER TO RECOVER ADVANCES.

The statute of South Carolina (Rev. St. § 1859 et seq.), which declares void contracts for the sale and purchase of certain articles, including cotton, for future delivery, unless it is the bona fide intention of both parties at the time that the article shall actually be delivered and received in kind at the time specified, as construed by the supreme court of the state, does not preclude the recovery by a broker of margins advanced for his principal on purchases of cotton for future delivery, on a cotton exchange, although the principal in fact intended not to receive the cotton, but to speculate on the fluctuation in price, where he kept such intention secret, and it was not known to the broker, who made the purchases in good faith, and in the belief that an actual purchase was intended.

5. SAME.

There is no principle of general law upon which a principal can avoid liability to his agent for advances made in good faith on his request, because the contract on which they were made was rendered illegal by the secret intention of the principal not to perform the same in accordance with its terms.

6. APPEAL—QUESTIONS PRESENTED BY RECORD.

An assignment of error on the ground that defendant was estopped by his previous conduct from setting up a certain defense in support of which he introduced testimony in the court below cannot be considered by the appellate court, unless based on some objection and exception to the evidence taken in the trial court, and shown by the record.

In Error to the Circuit Court of the United States for the District of South Carolina, at Greenville.

For opinion below, see 111 Fed. 470.

¶ 1. See Contracts, vol. 11, Cent. Dig. §§ 455–458.

C. P. Sanders and T. P. Cothran, for plaintiffs in error.

Stanyarne Wilson, for defendant in error.

Before GOFF, Circuit Judge, and BRAWLEY and KELLER, District Judges.

KELLER, District Judge. In October, 1900, the defendant, a farmer of Spartanburg county, S. C., employed the plaintiffs, who were members of the New York Cotton Exchange, to purchase cotton for him for future delivery. The first order given by the defendant, which will serve as an illustration of all others of a similar character, is as follows:

"The Western Union Telegraph Company.                    ⁰

"Received at Cotton Exchange Building, N. Y., Oct. 2, 1900.

"Dated at Spartanburg, S. C., Oct. 2nd.

"To J. H. Parker & Co., N. Y.: Buy me five hundred bales May cotton at nine seventy-eight or lower.                    W. A. Moore."

On the date of the receipt of the above telegram the plaintiffs sent the following message in answer:

"The Western Union Telegraph Company.

"October 2, 1900.

"To W. A. Moore, Spartanburg, S. C.: Bought five May 78.

"J. H. Parker & Co."

On the same day the plaintiffs sent the following letter to the defendant:

"J. H. Parker & Co., Cotton Exchange.

"New York, Oct. 2, 1900.

"Mr. W. A. Moore—Dear Sir: Under your recent instructions we have this day bought for your account and risk, in conformity with the rules and customs of the N. Y. Cotton Exchange:

"Quantity and Description.                    Price.
        500 B. C. May.                    9.78.

"Please take notice that all orders for the purchase or sale of cotton, coffee, grain, and provisions for future delivery are received and executed with the distinct understanding that actual delivery is contemplated, and the party giving the order so understands and agrees. It is further understood that on all marginal business the right is reserved to close transaction when margins are near exhaustion, without notice.

"Respectfully,                    J. H. Parker & Co.,
                                        "Per C."

Other purchases and sales were made by the plaintiffs for the defendant, from time to time, in accordance with his instructions, and in each case, upon executing his order, the plaintiffs sent to the defendant a letter similar in character to the one above reproduced.

By October 12, 1900, Parker & Co. had purchased and were carrying for the account of defendant 1,200 bales of cotton, 400 of which were deliverable in January, 300 in March, and 500 in May, 1901. Up to this time the defendant had had on deposit with plaintiffs margins sufficient for the purpose of carrying these contracts in accordance with the rules of the New York Cotton Exchange. At this time the price of cotton declined, and additional margins were demanded, under the rules, by the persons from whom Parker & Co. had bought the cotton, and plaintiffs made various calls upon defendant for these

margins, between October 10 and October 24, 1900. A small amount was sent by defendant, with promise of further remittances, but on October 23, 1900, a final call was made by plaintiffs for over $4,000 in margins, requesting defendant, if he could not send the money, to instruct plaintiffs to close his contract. No reply being received, the plaintiffs, on October 24, 1900, sold the 1,200 bales of cotton at a loss of $4,333.71. In April, 1901, the plaintiffs brought their action in the circuit court of the United States for the district of South Carolina for the recovery of the aforesaid sum advanced by them upon the transaction hereinbefore referred to.

Upon the trial evidence was introduced of the nature of the written contracts, the rules of the New York Cotton Exchange, requiring all contracts for the future delivery of cotton to be made in contemplation of its actual delivery, and, as stated by the learned judge below in his opinion, "the plaintiffs, in a carefully prepared case, proved every step necessary to sustain their demand." By way of defense, the defendant alleged, and was permitted, without objection, to testify, that it was never at any time his intention to actually receive any of the cotton bought by Parker & Co. for him upon his several orders, and that so far as he was concerned the transactions were mere deals in the price of cotton, and were entirely speculative and gambling transactions. In his answer filed to plaintiffs' complaint he had alleged that plaintiffs were participes criminis in such gambling transactions, and that plaintiffs, "beyond question, knew that they were acting for defendant in nothing but gambling transactions, and were profiting from them." No attempt was made upon the trial to prove this allegation in the answer, but, on the contrary, the plaintiffs proved that, so far as they were concerned, the transactions were made under the rules of the New York Cotton Exchange, which contemplate the actual delivery of the cotton, and they proved the notice to the defendant of the terms under which the cotton was bought, by showing the delivery to him, at each transaction, of a notice similar to that embraced in the letter hereinbefore reproduced.

After the introduction of the evidence of the defendant as to his intention to speculate in cotton, and not to buy it, the attention of the court below was called to the statutes of South Carolina (Rev. St. § 1859 et seq.), and to the case of Harvey v. Doty, 54 S. C. 382, 32 S. E. 501, construing those statutes; and thereupon the court, suo motu, entered an order of nonsuit.

Various assignments of error are made by plaintiffs in error, but, in our view of the case, it will not be necessary to consider all of these at large.

The first assignment of error is as follows:

"The testimony shows that the contracts out of which the plaintiffs' claim arose were made in New York, and to be performed in New York. As to their nature, interpretation, and obligation the contracts were governed by the laws of New York, and not by the laws of South Carolina. The testimony shows that the contracts out of which the plaintiffs' claim arose were contracts for the future delivery of cotton made upon the floor of the New York Cotton Exchange; that under said rules actual delivery of the cotton was required; that under the laws of New York such contracts were valid and enforceable. The presiding judge should have so held."

This assignment of error cannot be sustained. The question as to the true meaning and intent of the contracts out of which the plaintiffs' claim arose was a proper subject of inquiry, and cannot be said to have been determinable independently of the effect of the statutes of South Carolina. It is undoubtedly true that ordinarily the validity and effect of a contract are to be determined by the law of the place where it was made, but this rule is subject to the exception that no nation or state is bound to recognize or enforce contracts made elsewhere, which are injurious to its own citizens or subjects. The only general rule that can be laid down is that contracts and liabilities, recognized as valid by the laws of the state or country where made or established, may be enforced in the courts of another state or country where the action is brought, unless contrary to morals, public policy, or the positive law of the latter, in which event they will generally not be enforced. Midland Co. v. Broat, 50 Minn. 562, 52 N. W. 972, 17 L. R. A. 312; Fôrepaugh v. Railroad Co., 128 Pa. 217, 18 Atl. 503, 5 L. R. A. 508, 15 Am. St. Rep. 672; Sondheim v. Gilbert, 117 Ind. 71, 18 N. E. 687, 5 L. R. A. 432, 10 Am. St. Rep. 23; Lumber Co. v. Lang, 28 Or. 246, 42 Pac. 799, 52 Am. St. Rep. 780; Knowlton v. Doherty, 87 Me. 518, 33 Atl. 18, 47 Am. St. Rep. 349; Ex parte Dickinson, 29 S. C. 453, 7 S. E. 593, 1 L. R. A. 685, 13 Am. St. Rep. 749; Mumford v. Canty, 50 Ill. 370, 99 Am. Dec. 525; Kanaga v. Taylor, 7 Ohio St. 134, 70 Am. Dec. 62; Parsons v. Trask, 7 Gray, 473, 66 Am. Dec. 502; Buckner v. Watt, 19 La. 216, 36 Am. Dec. 671; Hinds v. Brazealle, 2 How. 837, 32 Am. Dec. 307.

In a line of decisions embracing Gist v. Telegraph Co., 45 S. C. 370, 23 S. E. 143, 55 Am. St. Rep. 763, Riordan v. Doty, 50 S. C. 547, 27 S. E. 939, and Harvey v. Doty, 54 S. C. 382, 32 S. E. 501, the supreme court of that state has decided that suits brought therein for the enforcement of any right or claim arising out of a contract for the future delivery of cotton or the like must be governed, as to the interpretation of the contract and the morality of the claim, by the laws of South Carolina, even though the contract was made and to be performed in another state; this on the ground, as stated in Gist v. Telegraph Co., that "contracts which are regarded as contra bonos mores in one state cannot be recognized there, although they are regarded as valid in another state where made and to be performed."

The United States courts will follow the rules laid down by the highest court of a state in the matter of determining whether the lex loci contractus or the lex fori shall govern. The federal courts will also follow the highest courts of the state in the construction of its statutes and its constitution, except where they may conflict with the constitution of the United States, or some statute or treaty made under it. Shelby v. Guy, 11 Wheat. 361, 6 L. Ed. 495; McCluny v. Silliman, 3 Pet. 278, 7 L. Ed. 676; Van Rensselaer v. Kearney, 11 How. 297, 13 L. Ed. 703; Webster v. Cooper, 14 How. 504, 14 L. Ed. 510; Elmendorf v. Taylor, 10 Wheat. 152, 6 L. Ed. 289; Bank v. Dudley, 2 Pet. 492, 7 L. Ed. 496; Leffingwell v. Warren, 2 Black, 599, 17 L. Ed. 261; Jackson v. Chew, 12 Wheat. 153, 6 L. Ed. 583.

For similar reasons the second assignment of error cannot be sustained.

The court, after the introduction of the defendant's evidence, in which he was permitted (without objection made) to testify that he did not intend to actually receive the cotton ordered by him through the plaintiffs, suo motu directed a nonsuit. This, we think, was clearly error. Evidence had already been introduced by the plaintiffs tending to show that the defendant intended to receive the cotton. He had ordered it to be bought for him. He was notified from time to time by plaintiffs, who acted as his agents, that it had been bought in conformity with the rules and customs of the New York Cotton Exchange, and that the orders had been received and executed with the distinct understanding that actual delivery was contemplated, and in no single instance had he demurred to this action of his agents, or repudiated it, but had by silence assented to the purchase upon the conditions stated; and surely it was a question for the jury to say whether the evidence adduced before them as to his intention, evidenced by a course of dealing extending over a considerable period of time, should or should not outweigh a self-serving declaration made by the defendant at the time of trial, that he did not mean to do that which the correspondence introduced in evidence tended to show he had done. The jury, upon a submission of the question to it, might have thought that "actions speak louder than words," and might have found that at the time the cotton was ordered defendant really did mean to buy it subject to actual delivery, notwithstanding his denial on the stand. But, as we conceive the case, the intention of the defendant was not necessarily conclusive as to the right of plaintiffs to recover. The action of the court below was, no doubt, based entirely upon what was conceived to be the effect of the decision in Harvey v. Doty, 54 S. C. 382, 32 S. E. 501. The syllabus in that case is as follows:

"A party in this state, gambling in grain futures in the Chicago Exchange, by an agent, cannot be required, under our statutes against gambling, to repay his agent advances made for his benefit, on the ground that such agent acted with the Chicago trader as a principal, and both had the bona fide intention to deliver the grain at the specified time."

This syllabus undoubtedly looks very much as though the court had decided that, if the intention of the South Carolina principal were to gamble, it made no difference what the intention of his agent was, the contract would still be obnoxious to the laws of the state, and consequently not enforceable there, because contra bonos mores. But there was a very important element which appeared in that case, and was commented on in the opinion of the court, which has no place in the one at bar, and that is the question of knowledge by the agent of the illegal intent of the principal. In its opinion in Harvey v. Doty, the court, in discussing the evidence, says:

"It should be borne in mind that the record discloses that plaintiffs and defendant are directly at variance as to whether plaintiffs knew of defendant's purpose to gamble in grain futures. Plaintiffs say they did not know; the defendant insists that they had full knowledge. Of course this is a question for the jury, and by their general verdict we are obliged to assume that they found in favor of defendant's contention."

This is tantamount to saying that if plaintiffs had not known of defendant's illegal intention, and had themselves honestly acted in his interest, with no intent to violate the statutes of the state, they would have been entitled to recover for advances, notwithstanding the concealed fraudulent intention of their principal. Indeed, we do not see upon what theory a court could hold otherwise. The court in the same case further says:

"It is certain that, no matter how the grain dealers in Chicago may have considered Harvey & Co., the plaintiffs were always obliged to be bound by their agency to Doty."

This is undoubtedly true, and, as a corollary, it is equally true that they could not be bound or affected by a concealed illegal intention on the part of their principal. The court, in Harvey v. Doty, rightly held that the question of knowledge on the part of the agents of the illegal intent of their principal was of the essence of the case, and affected their right to recover advances.

In Roundtree v. Smith, 108 U. S. 276, 2 Sup. Ct. 632, 27 L. Ed. 722, Mr. Justice Miller, delivering the opinion of the court, says:

"It is to be observed that the plaintiffs in this case are not suing on these contracts, but for services performed and money advanced for defendant at his request; and though it is possible they might, under some circumstances, be so connected with the immorality of the contract as to be affected by it, if proved, they are certainly not in the same position as a party sued for the enforcement of the original agreement."

It seems to us that, to be so connected with the immorality of the contract as to be affected by it, knowledge of the immoral intent of the principal, or an immoral intent on the part of the agent, would be essential, and if the decisions of the courts of South Carolina held otherwise we should hesitate to consider ourselves bound by them in that regard; but, as seen above, they do not so hold.

The supreme court of the United States, in the case of Higgins v. McCrea, 116 U. S. 671 et seq., 6 Sup. Ct. 557, 29 L. Ed. 764, adverted to this principle. In that case, in which a broker's firm in Chicago endeavored to recover for advances made on behalf of a customer, it appeared that the brokers had actually canceled the contracts purchased for their customer during the time when he was protecting the same with margins, and failed to substitute others for them in accordance with the rules of the Chicago Board of Trade. Upon suit for such advances he defended upon this ground, and the further ground that he was speculating only, and filed a counterclaim to recover money which he had paid the brokers in pursuance of the said contracts. In its opinion in the above case the supreme court uses the following language:

"In the present case the plaintiffs alleged and insisted that their transactions with the defendant were carried on with no unlawful purpose. On the other hand, the defendant alleged and insisted that in the same transactions he intended to violate the law. We see no reason why in such a case the plaintiffs might not, if they had not canceled the contracts, recover the money paid by them for the defendant, while at the same time the defendant could not recover the money advanced to the plaintiffs for what he intended to be an unlawful purpose. In Holman v. Johnson, Cowp. 342, it was said by Lord Mansfield that 'the objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds, at all times,

very ill in the mouth of the defendant. It is not for his sake that the objection is ever allowed; but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may say so. The principle of public policy is this: "Ex dolo malo non oritur actio." No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appear to arise ex turpi causa, or the transgression of a positive law of the country, then the court says he has no right to be assisted. It is upon that ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So, if the defendant and the plaintiff were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it, for when both are equally in fault, "potior est conditio defendentis." ' If, therefore, the defendant intended to embark his money in an illegal and criminal venture, we do not see how his case is helped by the fact that the purpose of the plaintiffs was to invest the money so advanced in what they understood to be a lawful and innocent transaction."

Any construction of a contract of agency which would hold it to be good or bad in accordance with the concealed intention of one of the parties to be bound by or to violate a provision of positive law would be subversive of the rights of the innocent party thereto, and not to be tolerated, and such is not the intent of the South Carolina statute.

In the record of the case. at bar we do not find any evidence to show that the plaintiffs knew of the intention of the defendant not to receive the cotton bought upon his several orders, but, even if such evidence had appeared, it would have been for the jury to pass upon.

It has been urged in argument that defendant was estopped by his course of acting from denying that he intended to take the cotton, and we are inclined to think that had this question been raised at the proper time and in the proper manner there is a great deal in it. Defendant is a cotton raiser. Suppose before his cotton was matured he had sold 100 bales of it to another, to be delivered at a future date, and when the time for delivery arrived the price of cotton had declined below the contract price. Could it be contended that the purchaser under that contract could free himself from responsibility by declaring that he never intended to receive it? It may be said that such a case is different, in that the seller is the owner of the cotton, and the contract protected under the first clause of section 1859, Rev. St. But in the case supposed the seller is not the owner of any "bales of cotton," but only of an unmatured crop, which may never be gathered, or may prove less than 100 bales when gathered. In such a case, would not the act of the purchaser in buying the cotton estop him, when the price had declined, from denying that he intended to receive it, if he had purchased it according to the usages of the cotton trade?

That assignment of error, however, cannot be taken advantage of for the first time in the appellate court. We do not find in the record that the evidence complained of was objected to, or that any motion was made to strike it out after it was introduced, and it is essential to its consideration by this court that somewhere in the record the objection to the admission of the testimony should appear. And while it appears from the opinion of the learned judge below that the

point was made in argument before him, yet there is no objection or exception in the record upon which to base this assignment of error. However, for the reasons herein assigned, we are of opinion that the judgment of the court below should be reversed and set aside, and a new trial awarded, with costs in this court to the plaintiffs in error. It is accordingly so ordered. Reversed.