## In re ÆTNA COTTON MILLS.

### Ex parte KNIGHT, YANCEY & CO.

(District Court, D. South Carolina. July 16, 1909.)

BANKRUPTCY (§ 314*)—CLAIMS PROVABLE—LEGALITY—GAMING CONTRACTS BY CORPORATION.

A contract made by a cotton mill company for a purchase of cotton for deferred delivery at different times, but which also contained a put and call clause, under which the parties had actually settled one loss by the company without any delivery, taken in connection with extrinsic testimony tending to show that no deliveries were intended by the parties, *held* to be a gambling contract which the corporation had no power to make and which created no liability provable against its estate in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

In Bankruptcy. On review of order of referee.

Miller & Whaley, for bankrupt.

Sanders & De Pass, for Knight, Yancey & Co.

BRAWLEY, District Judge. This is a petition to review the order of the referee allowing a claim of Knight, Yancey & Co. The claim is for a balance alleged to be due upon an account for losses sustained upon certain contracts for the future delivery of cotton. There are four contracts for the sale of 250 bales, each dated June 2, 1905, and in form are for the sale of 250 bales of cotton deliverable at Union, S. C.; the first being for delivery in October, and the others for deliveries in November, December, and January, respectively, the price fixed being at 30 points on January delivery in New York, the price to be called at buyer's option on any day prior to September 25, 1905, and, if the price is not called by buyer prior to September 25th, the seller has the option to fix the price within five days thereafter. The third stipulation in the printed form of contract is as follows:

"Buyer has the option on any day prior to September 25, 1905, to put the cotton to the seller at 23¾ points on January delivery, in New York."

The fourth stipulation is:

"Buyer having exercised the option to put must again call as provided for in section 1."

Fifth:

"If the price is not fixed after the put at buyer's call, as provided for in section 1, it shall be fixed by seller, as provided for in section 2."

Sixth:

"Put and call to be repeated one or more times at buyer's option, prior to September 25, 1905."

Seventh:

"Cash settlements to be made on each put, based on an average weight of 500 lbs. per bale."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Each of the contracts is signed "Ætna Cotton Mills, W. II. Sartor, President and Treasurer." The Ætna Cotton Mills is a corporation in the state of South Carolina, engaged in the business of manufacturing cotton. At the head of each contract, under the heading, "W. D. Nesbitt & Company, Cotton Brokers," there are the words, "Contract for deferred delivery of spot cotton."

There is no doubt that the Ætna Cotton Mills, engaged in the business of manufacturing cotton, could lawfully buy cotton for future delivery; but it ought to be equally clear that the interest of the stockholders of that company is that its capital shall not be subjected to the risk of enterprises not contemplated in its charter. It is to the interest of the public that corporations shall not transcend the powers granted, and every one entering into a contract with a corporation must take notice of the legal limits of its powers. Upon the face of these contracts it is apparent that provision is made for a speculation in cotton. By the terms of paragraph 3, the buyer has the option on any day prior to September 25th to put the cotton to the seller at 23¾ points on January delivery in New York, and by paragraph 6 the "put and call" to be repeated one or more times at buyer's option prior to September 25, and by paragraph 7 cash settlements to be made on each "put" based on an average weight of 500 pounds per bale. On these puts and calls it is not pretended that actual cotton was to be delivered or received, and what was actually done was what presumably was intended to be done at the time the contracts were made, and what in terms they permitted to be done; that is to say, Sartor, as president of the cotton mills, exercised his option to put the cotton as provided in the contract within less than a month after the contracts were executed, and as the result of that operation nearly $12,000 was lost by the Ætna Company, settled in part by payments in cash, and in part by notes given in July, 1905, which have since been paid, and which Sartor contends was intended to be a settlement in full of the contracts.

The testimony of Sartor is that some three or four days before the contracts were made he met Nesbitt, one of the partners of Knight, Yancey & Company, at the office of Mr. Duncan at Union, and he says:

"We wanted to go into this speculation, or whatever you might call it [that is, he and Duncan]. We did not want to take spot cotton, so we talked it over."

He thus states the agreement with Nesbitt:

"Well, Mr. Nesbitt agreed to give us a contract of that kind, that we were not to take any spot cotton, and I then agreed to take the 1,000 bales, and Mr. Duncan agreed to take 6,000 bales, and then Mr. Nesbitt sent those contracts to us from Spartanburg."

He at first refused to sign the contracts which Nesbitt had forwarded, and repeats this conversation with Nesbitt:

"I told him that the contract read that I was to take the cotton, that that was not what I wanted, and he had agreed to allow me to deal in the cotton without taking it, that I could take a speculative contract. He then came to Union after we had refused to sign the contracts. I met him at Duncan's, and he objected to putting in this clause. I would not sign the contract the way it was written, so finally he said, 'Well, we cannot use those contracts

if we modify them or state that you are not to take the cotton, for we are to put these contracts up as collateral, for it takes money to run our business.' Then he said, 'I tell you what I will do, I will state to you as a member of the firm that, if you will go on and sign this contract, and have witnesses to it, we will not demand you to take the spot cotton.' I then signed the contract under that agreement."

## Mr. Duncan testifies as follows:

"Mr. Sartor objected to signing the contract on the ground that it contemplated the actual delivery of this cotton, and he did not expect to receive the cotton and did not want it, and would not sign the contract if he had to receive it. Mr. Nesbitt, after discussing it for some time, said he could not change the contract, as he had to put it up as collateral, 'but,' says he, 'I am willing to give you my word in the presence of Mr. Duncan and Mr. Patton (Patton is my stenographer) that you will not be forced to receive this cotton.' As to when Sartor signed the contract, I do not know. I do not know that he ever signed it. That is to my personal knowledge."

## Mr. Nesbitt, who was examined on this point, says:

"In making this contract Mr. Sartor wanted Knight, Yancey & Co. to agree that, in case he did not want to take spot cotton under the contract, he would not have to do it, and I tried to explain to him that such a contract would be illegal, that what we wanted and that what he wanted was a legal contract, that when the time came when he did not want the cotton, if it was convenient to us to take the cotton, we would try to take it, that we would try to arrange to take it."

I am of opinion: That the preponderance of the testimony is that these contracts were, and were intended to be, speculative contracts; that they were disguised under the form of contracts for deferred delivery of spot cotton. Both Sartor and Duncan testified that it was not Sartor's intention to buy actual cotton, and to have it delivered to the mills, and Nesbitt's testimony is not an unequivocal denial of the conversation that took place. The fact that the parties had actually settled differences arising out of the "put" transaction, and that the cotton bargained to be delivered was not actually delivered, tends to show that at the inception of the contract the parties intended to settle differences, and not deal in actual cotton. A gambling contract disguised under the form of legitimate business is none the less obnoxious. The learned referee, who saw the witnesses and heard the testimony, it seems to me, is evidently of the same opinion. He says in his report:

"The inclination of my mind is decidedly against the validity of the claim. It seems to me that while it may be perfectly legitimate and proper that a corporation, organized for the manufacture of cotton goods, should enter into a contract for the purchase of cotton deliverable at a future date, yet there is no good reason why such a contract should contain a 'put and call' gambling clause, by which a corporation is bound to follow the fluctuations of the cotton market upward and downward in the interval between the date of the contract and the day fixed for the delivery of the cotton, and to pay or receive margins as the case may be, to the prejudice always of the stockholders."

"It appears in evidence that these claimants have already received in cash under the automatic operation of these contracts nearly $12,000 of the money of the stockholders of this corporation, for which they have given nothing in return, and are now claiming some $1,500 more. Such a contract seems to me to be not only ultra vires, beyond the scope of powers granted in the charter to the incorporators, but to place the capital of the corporation at the mercy of any reckless or dishonest officer who may happen to have control

of the corporate funds, and at the same time a taste for 'puts and calls' on the Cotton Exchanges, but at the same time I think that we are bound by the decisions above cited."

The cases cited are Parker v. Moore, 115 Fed. 799, 53 C. C. A. 369, Springs v. Carpenter, 154 Fed. 487, 83 C. C. A. 327, and Sampson v. Camperdown Mills (C. C.) 83 Fed. 833. Parker v. Moore was an action to recover margins advanced by plaintiffs as brokers for defendants on purchases of cotton for future delivery made by defendants' order on the New York Cotton Exchange. Plaintiffs introduced evidence showing that in each case they advised defendant that the purchase was made with the distinct understanding that actual delivery was contemplated, to which he expressed no dissent. Upon the trial of the case the defendant testified that he did not intend to actually receive the cotton ordered by him through the plaintiffs, and the court, suo motu, directed a nonsuit. The Court of Appeals, considering the case, says:

"Evidence had already been introduced by the plaintiffs tending to show that the defendant intended to receive the cotton he had ordered to be bought for him. He was notified from time to time by the plaintiffs, who acted as his agents, that it had been bought in conformity with the rules and customs of the New York Cotton Exchange, and that the orders had been received and executed with the distinct understanding that actual delivery was contemplated, and in no single instance had he demurred to this action of his agents, or repudiated it, but had by silence assented to the purchase upon the conditions stated, and surely it was a question for the jury to say whether the evidence adduced by the plaintiff as to his intent, evidenced by a course of dealing extending over a considerable period of time, should or should not outweigh a self-serving declaration made by the defendant at the time of trial that he did not mean to do that which the correspondence introduced in evidence tended to show he had done. The jury, upon the submission of the question to it, might have thought that actions speak louder than words, and might have thought that at the time the cotton was ordered defendant really did want to buy it subject to actual delivery, notwithstanding his denial on the stand."

And again:

"In the record of the case at bar we do not find any evidence to show that the plaintiffs knew of the intention of the defendant not to receive the cotton bought, upon the several orders; but, even if such evidence had appeared, it would have been for the jury to pass upon."

A new trial was therefore ordered.

Springs v. Carpenter was a suit upon a note given to cotton brokers in New York in settlement of losses which had accrued in circumstances similar to the transaction referred to in Parker v. Moore, and in a short opinion in the Court of Appeals the court says:

"The plaintiffs testified that they had no knowledge of the intention of the defendants not to receive or deliver cotton when the contracts matured. The evidence offered by the defendants did not show knowledge on the part of the plaintiffs of the intention of defendants not to receive or deliver the cotton on the maturity of the contracts, other than that indicated by the character of the contracts themselves."

—and refers to its opinion in Parker v. Moore as controlling the case, holding that the court below should have directed a verdict for the plaintiff, saying:

"We find nothing in this record showing that the plaintiffs below knew of the intention of the defendants below, if in fact they had such intention, not to receive the cotton bought for them under their contracts, upon their orders."

In Sampson v. Camperdown Cotton Mills, Hammett, president of the cotton mills, had made contracts through his own brokers, Woodward & Stillman, for the purchase of cotton for future delivery. Sampson & Co. were the commercial agents of the Camperdown Mills, advancing money to it from time to time. They had no interest in these contracts at all, Hammett, as president of the mills, furnishing the money necessary to keep up his margins, but after a time he began to draw on Sampson & Co. to furnish the money. The court says:

"The record does not disclose any knowledge on their part of the inception of and the early payments upon this transaction."

And commenting on a letter of the president of the company, the learned judge says:

"It clearly appears from this letter that the purpose of purchasing cotton deliverable in the future was to advance the business of the Camperdown Mills, in the course of that business, and it was deemed a wise, perhaps necessary, precaution in the business, that they were not entered into as a speculation, or for the purposes of speculation."

It was contended that under the statute of South Carolina these contracts for the purchase of futures were illegal. Upon the facts of that case, the record not showing, as the court held, any direct evidence that the contract, valid on its face, was invalid, the decision was in favor of Sampson & Co.

It does not seem to me that any of the cases referred to by the referee are controlling here. They are all based upon contracts which differ essentially from those now under consideration, and the facts are different.

I am of opinion that the referee was in error in allowing the claim, and his order is set aside, and the claim is allowed.